**UNITED STATES of America, Plaintiff–Appellant,**

v.

**D.F., Defendant–Appellee.**

No. 94–2900.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1995.

Decided Aug. 25, 1995.

Stephen J. Liccione, Asst. U.S. Atty., Stephen A. Ingraham, Asst. U.S. Atty. (argued), Milwaukee, WI, for plaintiff-appellant.

Dean A. Strang (argued), Shellow, Shellow & Glynn, Milwaukee, WI, for defendant-appellee.

*Before* RIPPLE and ROVNER, Circuit Judges, and MILLER, District Judge.*

RIPPLE, Circuit Judge.

On January 5, 1992, a one-year-old girl was found dead in her home; six days later her two-year-old sister was found dead there. D.F., a juvenile cousin of the children, was charged, on November 17, 1993, with two counts of second degree murder. *See* 18 U.S.C. §§ 1111, 1153 and 5031. Following a two-day suppression hearing, the magistrate judge recommended that D.F.'s statements to mental health workers be suppressed because they were privileged communications. The district court agreed that the statements should be suppressed, but based the suppression on the involuntariness of the statements. The government has appealed that decision. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Facts*

In 1992, when D.F. was twelve years old, she was living with her aunt on the [redacted] reservation in Wisconsin.[1] On January 5 of that year, her one-year-old cousin was found dead. On January 11 her two-year-old cousin also was found dead. The medical examiner attributed the first death to Sudden Infant Death Syndrome and the second to Influenza A. A second medical examiner determined, however, that the deaths could have been caused by suffocation.

On December 4, 1992, D.F. was admitted, against her will, by her aunt and legal guardian to the county mental health facility, [redacted] Mental Health Center ("Center"). She remained in the Center until May 1993. D.F. had a history of assaultive behavior and drug and alcohol abuse; there is also evidence that she had suffered physical and sexual abuse during her childhood. At the time she was admitted, she was under a [redacted] Tribal Court order requiring D.F.'s guardian to seek mental health services for her.[2] The [redacted] County Department of Social Services also had recommended that D.F. be placed at the Center.[3]

D.F. was admitted to a locked ward for adolescents and was placed in the residential treatment program at the Center. Patients' freedom of movement while on the ward was restricted severely. In addition to the doors being locked, there were screens securing the windows and patients had to be escorted when they left the locked area. All patients were observed by staff at least hourly. On the one occasion when D.F. ran away from the Center, she was returned forcibly by the police the next day.

D.F. was first placed in the substance abuse program. She remained in that treatment until late January 1993. The treatment primarily was overseen by social worker

---

* The Honorable Robert L. Miller, District Judge for the Northern District of Indiana, sitting by designation.

1. D.F. is a juvenile. The district court assumed jurisdiction under 18 U.S.C. § 1153, which gives the court jurisdiction over a charge of murder committed by an Indian on a reservation. (We employ the word "Indian" to conform to the statutory language. In our normal usage, we would employ "Native American."). This case is before us under seal. We have redacted the names of persons and places involved, using the same format as did the district court. *See United States v. D.F.*, 857 F.Supp. 1311 (E.D.Wis.1994).

2. The [redacted] Tribal Court Order of August 17, 1992, required D.F.'s legal guardian to seek mental services for D.F. and ordered D.F. to complete the counseling. Defendant's Ex. 1. The State of Wisconsin provides services to [redacted] Indians who voluntarily submit to civil commitment. *United States v. Teller*, 762 F.2d 569, 577 n. 5 (7th Cir.1985) (citing 70 Op. Atty.Gen. Wisc. 219 (1981)).

3. The government described D.F.'s admission to the Center as "voluntary" because it was approved by her legal guardian (her aunt) and was not court-ordered. D.F. calls her admission "involuntary" because she opposed her guardian's decision to place her at the Center. D.F. asserts that the record bears out the district court's finding that her commitment was involuntary. The district court noted that, although D.F.'s aunt was technically responsible for her admission to the Center, she was heavily influenced by a pending court order and by the Department of Social Services' suggestion that D.F. be placed in the Center. The district court also noted that there is no evidence that D.F. played any role in the admission. *See* 857 F.Supp. at 1314.

R.M. When D.F. was next placed in the Seasons program for treatment of her behavioral problems, the treatment was overseen primarily by B.K. In each program, D.F. was under the care of a treatment team which included a psychiatrist, a social worker, a registered nurse and other therapists. The plan of treatment included a point system to encourage good behavior and program participation. The system was based on levels which utilized privileges and punishment. Patients on the lowest level ("base zero") were confined to their rooms in only hospital gowns and no shoes, and were forbidden to talk to other patients; those on higher levels were allowed to have their own clothes and to interact with others as they saw fit. Patients were encouraged to talk and to write about their problems. They could earn points, and thereby move up levels, for having conversations with their assigned staff member at least once a shift. On the other hand, they lost points for refusing to answer questions or to write in a journal. Medication was also administered to patients by staff decision; D.F. was given Thorazine, Ativan, and Zoloft at one time or other.

Prior to her admission to the ward, D.F. had become a suspect in the deaths of her two young cousins. Staff at the Center were made aware of this suspicion in mid-December, 1992, when a social worker from [redacted] County Human Services notified Center staff. Tr. at 284; Ex. B–2. After that time, the Center staff often reminded D.F. about the state law reporting requirements and the consequences of D.F.'s statements or admissions. Nevertheless, in line with the hospital policy of encouraging patients to write about and to discuss their problems, D.F.'s treatment was designed to develop trust in staff and to encourage D.F. to reveal her secrets and to speak openly with staff about physical harm she had caused other children. D.F. was questioned directly by staff whether she had ever murdered anyone, and was asked repeatedly to make lists of all the people she had ever harmed.

One week after her arrival at the Center, D.F. was informed that her records as an alcohol abuser were confidential, but that any information about suspected child abuse or neglect was not protected. She signed a form indicating that she understood.[4] Ex. B–1. In addition, D.F. was warned on several occasions that any disclosures about hurting or killing a child would have to be reported to Protective Services.[5] D.F. did not discuss any of her past assaultive behavior for several months. On one occasion, D.F. told a staff member that she couldn't talk with staff because they were required to report what she said. Nevertheless, during her stay at the Center, D.F. did make several admissions regarding past assaultive behavior. In January 1993, D.F. admitted that she had abused three cousins. However, after signing a release to permit disclosure of the statements to social service authorities, D.F. was not prosecuted for these assaults by the [redacted] County tribal authorities. Instead, she was told that Human Services had decided tentatively to "shelve" any charges or consequences for her assaults. Furthermore, she was promised that no harm would come to her as a result of these admissions as long as she continued to make progress and to follow treatment expectations.

---

4. Concerning abuse, the confidentiality form stated: "Federal laws and regulations do not protect any information about suspected child abuse or neglect from being reported under State law to appropriate State or local authorities." Ex. B–1. The government contends that statements not relating to child abuse could be reported, at the social worker's discretion, to social services, the juvenile court, and the school. Tr. at 128–31. The government interprets state law, Wis.Stat. Ann. § 48.981, to require the facility to report suspicions that a child-patient had been abused, but to permit it to report that a child-patient had perpetrated the abuse of other children. D.F. questions the government's reading of Wis.Stat. § 48.981, and notes that the district court rejected that interpretation. The district court appears to have been of the view that D.F.'s statements to the staff could not be reported to law enforcement authorities. In any case, D.F. submits, no staff member suggested that her admissions might be reported to police or the court; "the local child protective services agency and other sponsors of the Seasons program were the only organizations mentioned."

5. The government points out that all the Center staff having contact with D.F. were covered directly or indirectly by the reporting requirements.

Some of the staff at the Center believed that they were under a legal obligation to report any admissions of child abuse to the authorities. Because they believed that any admission on the part of D.F. would have substantial criminal consequences for her, some of the staff also tried to protect her from the consequences of any confessions by arranging for her to undergo a "5th Step" session with a local minister. They anticipated that D.F.'s conversation with the minister would be privileged and therefore would give her a "safe harbor" where she could make the anticipated disclosures without her having to risk a report to the authorities. However, the session, which was held on March 16, 1993, apparently did not produce the hoped-for result. Tr. at 42–43; 297–98; 337; Ex. A–1. There were also discussions among the staff as to whether the staff could report D.F.'s admissions to authorities.

Other staff members at the Center believed that D.F. would benefit from taking responsibility for her wrongs and being held responsible for them. Some staff members at the Center were anxious to ensure that D.F.'s statements were reported accurately. One staff member, D.F.'s primary social worker in the Seasons program, B.K., prepared memoranda on her home computer in order to refresh her memory for the purposes of treatment or testimony in court.[6] After D.F.'s confession, staff at the Center cooperated with the F.B.I. D.F. was never informed of this cooperation, and was encouraged to continue to discuss the incident in therapy sessions.

On April 5, 1993, four months after her admission to the Center, D.F., at that time fourteen years old, admitted to having killed her two young cousins. In a group therapy session run by B.K., D.F. spontaneously told the group that she had killed her cousins. Several hours later she told another staff member of the murders, and of her relief in the disclosure because the secret had been "eating her up." During a treatment team meeting the next day, when B.K. told the other therapists of D.F.'s statement, another staff member immediately reported D.F.'s confession to Child Protective Services, a division of the [redacted] County Department of Social Services, which in turn notified the F.B.I. R. 29 at 53. The resulting F.B.I. investigation led to the charges in this case. D.F. made nine other confessions while a patient at the Center.

On April 22, 1993, an appointed attorney advised D.F. not to speak to anyone about her April 5 admission; she then signed a statement invoking her Fifth Amendment right against self-incrimination. Tr. at 65–66; 74–75; 358; 364–65; Ex. A–5; Def's Ex. 12. D.F. claims B.K. ignored her invocation of her Fifth Amendment rights; the government disagrees, noting that B.K. canceled a planned interview between the F.B.I. and D.F. In fact, stated the government, no law enforcement officer interrogated D.F. or heard her confessions. D.F. also states that "therapists were cooperating with law enforcement not later than Apr. 16." Appellee's Br. at 12. The government argues that there is no evidence that anyone other than B.K. "cooperated" with law enforcement.

### B. *Judicial Proceedings*

D.F. was charged with two counts of murder in the second degree, in violation of 18 U.S.C. §§ 1111, 1153, and 5031. Prior to trial, D.F. moved to suppress her confessions on the ground that they were coerced in violation of the Fifth Amendment's privilege against self-incrimination and guarantee of due process. The magistrate judge recommended that the statements be suppressed, not on the basis of the right against self-incrimination, but on the ground that the

---

6. On April 5, after D.F.'s admission, B.K. used her home computer to write a memorandum recording D.F.'s statements, often using quotation marks. She prepared other such memoranda about D.F., too, to "trigger for myself my impressions as a therapist at the time." R. 30 at 367. B.K. conceded that a secondary motive for the reports was to refresh her recollections for later testimony. Concerning whether her pur-

pose in making the written notes was to assist D.F.'s therapy or to assist law enforcement, B.K. said:

And I repeat that [that] purpose would be so far removed from my primary [therapeutic] purpose as to be, yeah, in the back of my mind, but certainly not up front as a major concern at the time I wrote these notes.

Tr. at 368.

statements were protected from disclosure by a psychotherapist-patient privilege.

The district court agreed that the statements ought to be suppressed. *United States v. D.F.*, 857 F.Supp. 1311 (E.D.Wis. 1994). It declined to base its ruling either on the psychotherapist-patient privilege or on non-compliance with *Miranda*. Instead, the district court grounded its suppression of D.F.'s statements as involuntary under the Due Process Clause of the Fifth Amendment. Focusing on the holding of the Supreme Court of the United States in *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986), the district court rejected the view that the strictures of the Fifth Amendment's Due Process Clause are applicable only when the impermissible pressure is brought by law enforcement personnel. Rather, it read *Connelly* to permit the suppression of a statement as involuntary when impermissible pressure had been brought by others working on behalf of the state: "I only suggest that that inquiry can go beyond the actions of traditional 'law enforcement' personnel to the actions of the juvenile court system, the legislature, other government officials, and the reasonable feelings of the defendant." 857 F.Supp. at 1325.

The court reviewed the evidence and made factual findings concerning the staff members' views of therapy. The district court noted that some of the Center staff "took a more expansive view of 'therapy' and 'recovery.' Staffers subscribing to this expanded view felt that D.F. would not recover unless and until she took responsibility for her wrongs and was held accountable for them, in a court of law if necessary." *Id.* at 1316. It also found that R.M.'s promise to D.F. "sent two very clear messages: (1) D.F.'s frank disclosure of her past behavior would be generously rewarded, and (2) she would likely be granted leniency on any future disclosures." *Id.* "On April 5, 1993, she broke down and confessed." *Id.* at 1317.

The district court also assessed the Center's relationship with other governmental organizations. The court noted that the staff knew of D.F.'s suspected involvement in the deaths of her cousins and encouraged D.F. to talk about her past crimes. It also found "extensive evidence in the record of the close relationship between staff at the Center and Protective Services, the juvenile court system, and the F.B.I." *Id.* at 1326. It noted that the record established that "many of the staff at the Center saw themselves as an arm of law enforcement." *Id.* "Moreover, the evidence suggests that the warnings [of the consequences of a confession] were minimal, and that, in any event, they never included any mention of D.F.'s Fifth Amendment privilege of self-incrimination." *Id.*

The court then concluded that D.F.'s will was overborne at the time she confessed:

> After considering the totality of the circumstances, I conclude that D.F.'s inculpatory statements were secured through psychological coercion and were not the "product of a rational intellect and free will." *Blackburn [v. State of Alabama]*, 361 U.S. [199] at 208, 80 S.Ct. [274] at 280 [4 L.Ed.2d 242 (1960)]. Given the circumstances under which they were employed, the various "encouragement" techniques employed by the staff were highly coercive. A reasonable person of D.F.'s age, intellect, and mental state would have felt coerced. In sum, D.F.'s confession was not "voluntary" within the meaning of the Due Process Clause of the Fifth Amendment.

*Id.*

## II

## DISCUSSION

### A. *Threshold Matters*

#### 1. *Jurisdiction*

▄▄▄ In this case, the United States appeals a suppression order granted by the district court prior to D.F.'s trial. This court's review of the interlocutory decision is based on 18 U.S.C. § 3731, which states that "[a]n appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence." [7] *See United States v. Rodriguez,*

---

7. Because an expanding body of federal law developed from suppression rulings made without

975 F.2d 404, 408 (7th Cir.1992) (stating that § 3731, permitting government's interlocutory appeal from suppression orders, creates exception to finality requirement for appeal in 28 U.S.C. § 1291). In responding to the appeal, an appellee may rely on any ground in support of the judgment. *United States v. Finn,* 502 F.2d 938, 940 (7th Cir.1974) (citing *Langnes v. Green,* 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931) and *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).[8]

### 2. *Standards of Review*

Several standards of review are applicable to our consideration of the district court's granting of the suppression motion.

▉ We must assess the district court's understanding of any applicable substantive legal standard on a de novo basis. We owe the district court no deference on pure questions of law. *United States v. Doubet,* 969 F.2d 341, 343 (7th Cir.1992) ("To the extent that legal determinations factor into a suppression ruling, they are subject to de novo review."). On the other hand, a district court's fact-finding in support of its disposition of a pretrial motion to suppress is reviewed under a clearly erroneous standard. *United States v. Church,* 970 F.2d 401, 403 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993); *see also United States v. Garlock,* 19 F.3d 441, 442 (8th Cir.1994) (holding district court did not err in factual finding concerning state actors). This circuit recently determined that the voluntariness of a confession is assessed on appeal under the clear error standard of review. *See United States v. Baldwin,* 60 F.3d 363 (7th Cir.1995). That holding binds this panel as the law of the circuit.

### B. *Submissions of the Parties*

#### 1. *The Government*

The government submits that the district court erred in suppressing D.F.'s confessions.

It contends that her statements were voluntary because they were not coerced by any government conduct. A statement is voluntary, the government asserts, unless the defendant's will was overborne at the time of confession by coercive *police* activity. *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). To determine whether that standard has been met, a court must assess the totality of the circumstances. *See United States v. Rutledge,* 900 F.2d 1127, 1129 (7th Cir.), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). In this regard, continues the government, the record does not support the claim that Center personnel were agents of law enforcement. The government insists that the district court clearly erred in finding that Center staff (1) worked closely with law enforcement, and (2) reported immediately D.F.'s confession to Protective Services. It points out that B.K. discussed the confession at a team meeting, but that another member of the team reported it to Protective Services. It also contends that D.F. made eight confessions to staffers before there was any contact with the F.B.I. The government insists that the Center staff questioned D.F. for therapeutic reasons only, not to induce her to incriminate herself. The staff did not view itself as an arm of law enforcement, eliciting a confession. B.K. said:

> [W]e wanted to give her a vehicle for being able to talk about these things so that she could get past this very difficult time in her life and proceed in treatment. But we had to find a way to do that without setting it up so that she would have to tell us and we would have to tell the authorities.

Tr. at 42. According to the government, only B.K. had conversations with the F.B.I., and only after being advised that it was appropriate for her to do so. She confirmed

---

the benefit of appellate review, in 1968 Congress amended the Criminal Appeals Act (18 U.S.C. § 3731) to permit the government to appeal orders granting motions to suppress evidence made before the trial.

**8.** *See also United States v. Shameizadeh,* 41 F.3d 266, 267 (6th Cir.1994); *United States v. Becker,* 929 F.2d 442, 447 (9th Cir.), *cert. denied,* 502

U.S. 862, 112 S.Ct. 183, 116 L.Ed.2d 145 (1991); *United States v. Cahalane,* 560 F.2d 601, 608 (3d Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. Swarovski,* 557 F.2d 40 (2d Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 796 (1978).

the information about D.F.'s initial confession provided to the F.B.I. by the county Department of Social Services, and discussed the possibility of setting up a meeting between the F.B.I. and D.F. It is the government's view that the district court incorrectly characterized the staff as "surrogate investigators." 857 F.Supp. at 1325.

Turning to the other elements of coercion, the government argues that D.F.'s decision to confess was her own and was spontaneous. She interjected her confession in a group therapy session, taking her social worker completely by surprise. Tr. at 46–47. She told another staffer that night. Several days later, she assured therapist R.M. that she understood there would be consequences to her confession. There was no official coercion; she confessed in response to internal pressure. In fact, Center staff were seeking ways to prevent D.F. from having to face any legal consequences for her acts. There is no evidence that the Center used highly coercive techniques to encourage her to admit to crimes, as the district court claimed. 857 F.Supp. at 1325. D.F. was encouraged to talk about her problems, but was not coerced.

The government also submits that the court erred in finding that D.F.'s placement at the Center was "influenced ... by a pending court order." 857 F.Supp. at 1314. In the government's view, D.F.'s aunt, desperate to get help for D.F., chose the Center without the help of the juvenile courts. The decision to defer prosecution of D.F. for abuse was [redacted] County's, not a negotiated outcome with Protective Services, as the district court asserted.

The government also criticizes the district court for ignoring the ten subsequent consistent confessions made by D.F. The court

found that they were the product of staff pressure on her to expand upon the confession, and did not analyze them individually. This, says the government, was clear error. Subsequent confessions following a coerced confession can be voluntary where circumstances change.[9] *Oregon v. Elstad,* 470 U.S. 298, 310–11, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985). In the government's view, D.F. had a clear ability to resist pressure; she finally confessed because of her own conscience, not official coercion. Her will was not overborne. She made a deliberate choice to speak her mind. "The Constitution has not yet been interpreted to protect people against themselves." *Johnson v. Trigg,* 28 F.3d 639, 642 (7th Cir.1994).

### 2. D.F.

D.F. submits that the district court understood that coercive official action was required before a Fifth Amendment violation could be found, and that such coercion is not the exclusive province of the police department. In this case, D.F. was committed to the custody of county employees in a locked county institution for four months before she confessed. Relying on *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 195 n. 1, 109 S.Ct. 998, 1002 n. 1, 103 L.Ed.2d 249 (1989), D.F. asserts that county employees are state actors for purposes of the Fourteenth Amendment Due Process Clause, and surely must be so categorized for the Fifth Amendment, too. Here, she points out, the coercion came in the form of repeated questions, a point system of privilege and punishment, and inducements.

D.F. submits that the government's "real argument is that these actions, which the government presumably would concede

---

**9.** The government characterizes as voluntary the five confessions to nurses' assistants between April 5 and 17; D.F. initiated two, and responded to general questions like "what's the matter?" by confessing in the other three. According to the government, D.F.'s discussion with R.M., although initiated by him, was a voluntary confession in which she said she understood what she was doing. And, at the family therapy meetings, her confessions were also voluntary. Although not spontaneous, they were made in a noncoercive environment and were brought out for ther-

apeutic purposes. On April 14, 1993, when her sister denied that she was capable of having killed the children, D.F. insisted she committed the murders. The government also contends that the confessions made on April 23 and May 10 were voluntary—even though they were made after D.F. invoked her Fifth Amendment privilege and after B.K. had discussed the previous confession with the F.B.I.—because there was no evidence that B.K. sought to elicit anything from D.F. on behalf of law enforcement.

would meet the *Connelly* threshold if police officers had done them, are not official coercion because of the motives and job titles of those who in fact acted." Appellee's Br. at 29–30. But, D.F. insists, these Center employees are government agents and thus "state actors" like sheriffs and police officers. D.F. notes that, in *Connelly,* the defendant's confession to an off-duty policeman was "coerced" by the "voice of God," not by police activity. The Court held that only state coercion, not internal coercion, was sufficient to invoke the strictures of the Fifth Amendment. However, D.F. contends, *Connelly* "left room for the atypical case of state coercion, like this one, when it referred time and again more broadly to state action." Appellee's Br. at 31 (citing *Connelly,* 479 U.S. at 164–65, 107 S.Ct. at 520–21).

According to D.F., *Connelly* does not require an examination of the state employees' motives. Rather, it requires a focus on their activity. The proper inquiry is, "were the statements obtained through coercive means, as gauged 'from the perspective of a reasonable person in the defendant's position at the time of the statement.'" Appellee's Br. at 33 (quoting *United States v. Montgomery,* 14 F.3d 1189, 1194 (7th Cir.1994)). D.F. points to factors indicative of the involuntariness of her confession: the commitment to a locked mental hospital away from familiar people and surroundings; the [redacted] Tribal Court order; the staff's complete control of her life on the ward; the degrading disciplinary techniques; psychoactive drugs; strip searches; the suicide watch on her fourteenth birthday and at other times; the direct questions about her abuse and possible murder of small children.[10] D.F. reiterates the promises made to induce her compliance with therapy and questioning, and the complete lack of *Miranda* warnings. She contends that the district court's decision on voluntariness is thus well grounded in the overall effect of four months of "this barrage of inducements, deception, [and] psychological ploys," that led D.F. to trust the staffers. Appellee's Br. at 36–37.

D.F. describes her treatment as a "mixed message." She was given advice on confidentiality and cautioned about admitting child abuse, but was also pushed actively to make those admissions. Her first primary therapist, R.M., admitted the mixed signal (R. 30 at 324, 350, 351–52) and the district court agreed. 857 F.Supp. at 1317. D.F.'s actions reflected her confusion about whether she should speak freely. On March 2, 1993, however, R.M. promised her that, if she continued to make progress and to participate sincerely in therapy sessions, [redacted] County authorities would not prosecute or take other adverse action against D.F. for the injuries she had caused younger children. R. 30 at 327–29; Ex. B–5. The district court found this promise significant; it indicated that she would be rewarded and treated leniently for her frank disclosures. 857 F.Supp. at 1316. One month after the promise, D.F. confessed.

## C. Analysis

█ The Fifth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. The admission of an involuntary confession violates due process. A confession will be found to be voluntary only if the government can demonstrate that, under the totality of the circumstances and by a preponderance of the evidence, it was not secured by the government through psychological or physical intimidation, but rather was the product of a rational intellect and free will. *United States v. Montgomery,* 14 F.3d 1189, 1194 (7th Cir. 1994).

In *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the Supreme Court reaffirmed a requirement that some variation of police "overreaching" must be present before a defendant's confession can be labeled involuntary and subsequently suppressed. Justice Rehnquist stated in his opinion for the majority that "[we] hold that coercive police activity is a necessary predicate to the finding that a confession is not

10. D.F. points several times to the demand that she list the persons she had harmed physically, a demand made of her right after "KKK"—a racist message probably aimed at her—had been written on the girls' bathroom mirror, and everyone was being punished. D.F. claims she was particularly vulnerable then, and that the staff's demand was coercive.

'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167, 107 S.Ct. at 522. The Court surveyed the cases over the past fifty years and summarized:

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

*Id.* at 164, 107 S.Ct. at 520 (citation omitted). The Court stated that there must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." *Id.* at 165, 107 S.Ct. at 521. It underscored the "state actor" requirement by stating:

> The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause.

*Id.* at 166, 107 S.Ct. at 521.

■ We believe that the district court was correct insofar as it believed that, in assessing the voluntariness of a confession, the holding of *Connelly* does not restrict the protection of the Fifth Amendment's Due Process Clause to the actions of "law enforcement personnel." *Connelly* left undisturbed two of the Court's earlier cases in which the actions of non-police actors had been held subject to the constraints of the Fifth Amendment and therefore implicated the protection of *Miranda.*[11] In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Court held that a court-appointed psychiatrist must give *Miranda* warnings before questioning a prisoner. Although the psychiatrist had been appointed for the "limited, neutral purpose of determining [the defendant's] competency to stand trial," *id.* at 465, 101 S.Ct. at 1874, the government sought to introduce his observations and findings for the "much broader objective" of assessing the defendant's eligibility for the death penalty. *Id.* The Court held that the statement was inadmissible during the sentencing phase of the trial. The Fifth Amendment privilege against self-incrimination, the Court wrote, "'does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.'" *Id.* at 462, 101 S.Ct. at 1873 (quoting *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). The Court had no difficulty in assuming that the psychiatrist, although clearly not a government officer, and certainly not a prosecutorial officer, became, by virtue of his court appointment, a state actor.[12]

The other case, *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), held that an IRS agent must give warnings before questioning a prisoner. The Court noted that tax investigations, although not necessarily criminal at the outset, often later become criminal. *Id.* at 4, 88 S.Ct. at 1504–05. The Court did not question whether the agent, although not conducting a criminal investigation, was a state actor whose actions triggered the protection of the Fifth Amendment.

■ On the other hand, we do not believe that *Connelly* can be read as standing for the proposition that any "state actor" can trigger

---

**11.** These cases were decided in the context of *Miranda.* Therefore, strictly speaking, they deal with the right against self-incrimination, also protected by the Fifth Amendment. However, "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment." *Connelly,* 479 U.S. at 170, 107 S.Ct. at 523. Therefore, they are helpful in delineating the nature of governmental action that triggers the protection of

the Due Process Clause in the context of interrogations.

**12.** *Accord Battie v. Estelle,* 655 F.2d 692 (5th Cir.1981) (holding that testimony elicited by a court-appointed psychiatrist was inadmissible during the penalty phase of a capital case unless *Miranda* warnings had been given).

the concerns of the Fifth Amendment. Because the focus must be on the "nature of the statement ... and the exposure which it invites," *Smith,* 451 U.S. at 462, 101 S.Ct. at 1873, it is well established that the mere government employment of the questioner, standing alone, does not *necessarily* make one a "state actor" for this Fifth Amendment purpose. On this point the circuits have spoken with one voice, even if the application of the principle has, in some cases, been less than clear. In *United States v. Webb,* 755 F.2d 382 (5th Cir.1985), the defendant, knowing that he was implicated in a murder, fled the CID offices of the military base where he was stationed. He was discovered on a communications tower and threatened suicide. An Army psychiatrist was called, and he engaged Webb in a continuing conversation in order to prevent him from jumping. While talking to the psychiatrist, Webb confessed to the crime. The Fifth Circuit held that the psychiatrist's talk with Webb was not an interrogation. It also held, in the alternative, that the psychiatrist, although employed by the United States Army, was not a law enforcement officer. His talk with Webb had but one purpose—to save Webb's life. 755 F.2d at 391–92. *See also United States v. Moreno,* 36 M.J. 107 (C.M.A.1992)[13]

(finding that state social worker, hearing accused's confession, was not acting as "agent" of military investigators).[14] Similarly, in *United States v. Borchardt,* 809 F.2d 1115 (5th Cir.1987), the Fifth Circuit held that a nurse employed by a municipal hospital was not a government officer for purposes of the Fifth Amendment when she asked a federal prisoner-patient questions that had as their sole purpose the eliciting of information for the purposes of treatment. 809 F.2d at 1118–19. In both *Webb* and *Borchardt,* the person asking the questions was employed by a government entity. Each asked questions for the sole purpose of assisting the defendant with a medical problem. Accordingly, the questions did not implicate the strictures of the Fifth Amendment.

The Ninth Circuit dealt with a similar situation in *United States v. Eide,* 875 F.2d 1429 (9th Cir.1989). In that case, a pharmacist employed by the Veteran's Administration was accused of stealing drugs from a hospital. The local police waived a prosecutorial interest in the matter on the understanding that it would be handled as an internal Veteran's Administration matter. The defendant was then questioned by his VA superior

---

**13.** The United States Court of Military Appeals, from which this decision emanated, has been redesignated the "United States Court of Appeals for the Armed Forces" pursuant to the National Defense Authorization Act for Fiscal Year 1995, Pub.L. 103–337, § 924, 108 Stat. 2831. Also, the Court of Military Review is now called the "Court of Criminal Appeals." We follow the lead of the Supreme Court, *see Ryder v. United States,* —— U.S. ——, —— n. 1, 115 S.Ct. 2031, 2034 n. 1, 132 L.Ed.2d 136 (1995), and adhere to the former names in this opinion.

**14.** *Moreno* followed the same line of reasoning in a counseling setting. In this case a military man accused (and later convicted) of the sexual abuse of his stepson confessed to a state social worker during an interview in her office. He had gone to the interview eight days after the military investigation had been concluded and charges had been brought against him. The social worker had explained to him that she was subject to a court subpoena and could be compelled to testify about the interview, but that her agency would recommend probation if he were to make good progress in a rehabilitation program. Both the military judge and the Court of Military Review concluded that her investigation was sufficiently separate from the military investigation that she

was not obliged to advise the appellant of his rights under the Fifth Amendment or under Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831, a rights-warning requirement similar to, but broader than, *Miranda.* The Court of Military Appeals affirmed the earlier decisions after finding that the state social worker had not made improper threats or promises, and that the appellant had chosen to go to the social worker's office and to be interviewed by her. 36 M.J. at 112. The court noted particularly that the social worker did not consider herself "a law enforcement officer or on a law enforcement mission," and "was so far from acting as an agent of the military that the information had to be extracted from her by court process." *Id.* at 115. Although holding that the state employee had no obligation to advise the appellant of his rights under *Miranda* or Article 31 prior to the interview, the Court commented:

[W]e hasten to point out that, had [the social worker] been functioning as a mere conduit for military authorities or had there appeared to be some sort of tacit understanding designed to subvert the purposes of Article 31, we would have had little difficulty in reaching a very different conclusion.

*Id.* at 117.

and he made, under assurances of confidentially, incriminating admissions that were later used against him in a federal drug prosecution. The Ninth Circuit held that the VA supervisor was not a state actor for purposes of the Fifth Amendment because he was not acting in a criminal investigation or prosecutorial function. *Id.* at 1434.[15]

A contrary result was reached in *United States v. Diaz*, 427 F.2d 636 (1st Cir.1970). There a defendant, in custody and in the presence of the police, was interrogated by a draft board secretary about his failure to register under the Selective Service Act. The Court of Appeals for the First Circuit held that the fact that the questions were asked not by a law enforcement officer but by "a person who also performs routine procedural tasks for an administrative agency" does not alter the coercive atmosphere surrounding the questions. *Id.* at 638.[16]

*Commonwealth v. A Juvenile*, 402 Mass. 275, 521 N.E.2d 1368 (1988), because it bears some factual similarity to the case before us,

provides helpful guidance with respect to the application of these principles. In that case, a juvenile living at a state-supported home for troubled adolescents, to which he had been committed by the Commonwealth's department of youth services, was interviewed by the assistant director of the facility about an assault that had taken place in the vicinity. At the time of the interrogation, suspicion had focused on the juvenile. The assistant director had consulted with the police and he was "convinced the juvenile had committed a crime and questioned him several times before the juvenile confessed." *Id.* 521 N.E.2d at 1370. The Supreme Judicial Court of Massachusetts held that the trial court was on solid ground in its factual determination "in all the relevant circumstances," *id.* at 1370, that the assistant director was acting "as an instrument of the police." *Id.*

■ These cases make clear that it is not the particular job title that determines whether the government employee's [17] ques-

---

**15.** Another Ninth Circuit case addresses the issue in a very fact-specific context that sheds little light on the general principles. In *United States v. Roston*, 986 F.2d 1287 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 206, 126 L.Ed.2d 163 (1993), a person implicated in a ship-board murder was interviewed by the ship's doctor in the captain's cabin. The physician was a reserve police officer in the State of Hawaii. After the interrogation, the defendant was held under guard aboard the vessel which was under way at the time. The Ninth Circuit held that the interrogation was conducted by a person acting in a private capacity. His reserve appointment as a law enforcement officer was a "mere fortuity." Notably, the court did not discuss the possibility that, because the ship's doctor was acting under the authority of the captain of the vessel, he might have been undertaking a law enforcement function.

**16.** In this discussion, we have focused on cases involving, as does ours, the right against self-incrimination protected by the Fifth Amendment. Cases involving the Sixth Amendment right to counsel also provide a somewhat helpful analogy. In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) and in *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the Court examined whether the government had used a government agent and had focused deliberately on the defendant. The key in these cases has been whether the government directed the interrogator toward the defendant in order to obtain incriminating information. *See also United States v. York*, 933 F.2d

1343, 1355–56 (7th Cir.), *cert. denied*, 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991).

**17.** A similar analysis has been employed when the questioner is not a government employee but may have undertaken the questioning to fulfill a governmental obligation because of a special relationship imposed by law or contract. The Eighth Circuit recently "recognize[d] that the government can exercise such control over a private actor that a 'private' action can fairly be attributed to the government for purposes of the Fourth and Fifth Amendment[s]." *United States v. Garlock*, 19 F.3d 441, 443 (8th Cir.1994) (citing *Fidelity Fin. Corp. v. FHLB*, 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987)). In that case, a bank teller confessed to a bank security officer that she had embezzled bank money. The court reviewed the actions of the security officer, who was hired expressly to investigate the disappearance of money from the bank's vault, and the corporate auditor, who helped in the investigation and questioned the defendant before she confessed. The court affirmed the district court's determination that the two investigators were private actors outside the ambit of the Fourth and Fifth Amendments because there was no governmental nexus: (1) the bank, although heavily regulated by the government, is not an instrumentality of the government; (2) there was no evidence that law enforcement knew of the investigation prior to the defendant's confession; (3) the investigators were not private persons used to target a particular suspect; (4) the bank-

tioning·implicates the Fifth Amendment, but whether the prosecution of the defendant being questioned is among the purposes, definite or contingent,[18] for which the information is elicited. *See, e.g., Mathis,* 391 U.S. at 4, 88 S.Ct. at 1504–05 (determining that tax investigations, which "frequently lead to criminal prosecutions," require *Miranda* warnings when that possibility exists). The "particular office that the official who performs the custodial interrogation represents is inconsequential." *Battie v. Estelle,* 655 F.2d 692, 699 (5th Cir.1981). Therefore, although a government employee need not be a law enforcement official for his questioning to implicate the strictures of the Fifth Amendment, his questioning must be of a nature that reasonably contemplates the possibility of criminal prosecution.

■ In assessing whether a particular individual is acting in a capacity that contemplates prosecution as one of the fruits of his work, it is important to note, as the cases have recognized, that an individual can often play more than one role and that the subject does not always—and cannot always—appreciate the subtleties of such a dual role. As we noted in *Williams v. Chrans,* 945 F.2d 926, 952 n. 44 (7th Cir.1991), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992), one of the concerns in *Estelle* was the unexpected role-shifting that occurred when a neutral psychiatric interview was used as a tool for the prosecution. The Second Circuit also has stated that the concerns that animate *Estelle* are triggered whenever a defendant does not know that the prosecution might subsequently use the information against him in a manner unrelated to the purported purpose of the interrogation. *See United States v. Cortes,* 922 F.2d 123, 127 (2d Cir.1990); *see also United States v. A.R.,* 38

F.3d 699, 703 (3d Cir.1994) (indicating that Fifth Amendment concerns arise when a purportedly neutral examination is later used to prove an element of the government's burden in a criminal prosecution); *Gholson v. Estelle,* 675 F.2d 734, 738 (5th Cir.1982) (noting that such role shifting strikes at the heart of the adversary system and adds an element of unreliability to any evidence so presented).

The application of these principles to the context of psychiatric patients presents especially difficult analytical problems. A great deal of the available care in this area is administered by various governmental agencies, and those suspected of criminal activity are especially likely to be found in a facility operated under the auspices of a governmental agency. Consequently, the caregivers are employed by the government. Caregivers in the mental health field are often organized as a team in which everyone from the directing psychiatrist to the ward aide is an important part of the effort, and a free exchange of information among the staff is an imperative. Psychiatric care often involves, as it did in this case, an effort to have the patient discuss freely with the caregiver his apprehensions and fears. According to the record in this case, it is also salutary, at least in some situations, for the patient to take responsibility for his actions and to experience the consequences that flow from taking such responsibility.

■ However, if it can be reasonably concluded that the caregiver goes beyond these accepted medical roles and affirmatively takes on the role of delivering someone who is in his care and custody to the prosecutor, the district court is entitled to determine that the caregiver has changed his role substantially. As the district court recognized, the most obvious example of this dual prosecuto-

---

ing regulations requiring security officers to report internal bank crimes to the Officer of the Comptroller of Currency, not to law enforcement authorities; and (5) the investigators were not subject to the Fourth and Fifth amendments "simply because they were engaged in the 'public function' of law enforcement." 19 F.3d at 443. Because the bank investigators were pursuing the bank's valid interest in internal security, rather than the government's interest in a criminal conviction, the court held they were private actors.

**18.** We include the term "contingent" simply to take into account that the questioner, although clearly acting for a law enforcement purpose, may not have sufficient authority, as *Mathis* demonstrates, to control whether the ultimate disposition will be criminal, quasi-criminal or civil or, as in *Estelle v. Smith,* to control the precise use to which the statement will be put in the course of such a proceeding.

rial/healer role is when there is a specific arrangement between law enforcement and medical personnel to collaborate in the prosecution of an individual. *See D.F.*, 857 F.Supp. at 1326 n. 34. If those efforts are the cause of the confession, the Fifth Amendment's Due Process Clause is certainly implicated. Even if there is no explicit agency arrangement, the medical staff of a state facility can nevertheless decide that its cooperation in the prosecution of patients is part of its responsibility, and can include such a goal among its activities. In such a circumstance, the absence of a formal agreement with prosecutorial authorities cannot be deemed outcome determinative.

The district court's initial reading of *Connelly* may well have been broader than it should have been. The district court was correct in holding that state employees other than law enforcement officers can trigger, by their actions, the protection of the Due Process Clause of the Fifth Amendment. However, it might at first glance seem less than clear that the district court believed that such extra-police interrogation by other state employees or agents needed to be conducted at least in part for a law enforcement purpose in order to implicate those protections. As we have noted, *Connelly* cannot be read that broadly if it is to live in peace with the rest of our Due Process jurisprudence. It is clear that the state actor's questioning of the defendant must have as one of its purposes, definitive or contingent,[19] the use of the statement in a criminal prosecution. Even if we assume that the district court might have misapprehended the scope of *Connelly*, we must conclude that such an over-reading of

the precedent did not affect its analysis in this case. Here it is clear that the district court focused on whether the staff of the Center had assumed, as part of their function, the prosecution of D.F. Dealing with conflicting evidence and, necessarily, with the credibility of witnesses, the district court concluded that the record established

> coercion—indeed, a bit of overreaching—by government officials. Staff members at the Center were either enlisted or volunteered to act as law enforcement surrogates in eliciting confessions from troubled teens. There is extensive evidence in the record of the close relationship between staff at the center and Protective Services, the juvenile court system, and the F.B.I. There is also evidence that many of the staff at the Center saw themselves as an arm of law enforcement.

857 F.Supp. at 1325–26.

We believe that, whatever our own judgment might have been had we sat as trial judges in this case, a respect for the division of roles assigned to the trial and the appellate benches requires that we not disturb the district court's conclusion that the medical staff of the Center saw the prosecution of D.F. as a part of their work. Although the evidence is not at all one-sided, we cannot say that the court was clearly erroneous.[20]

Nor can we find that the district court erred clearly when weighing whether the confessions of D.F. were indeed involuntary. The court reviewed the efforts of the staff to gain her trust, the systems of rewards and sanctions that were imposed, the

---

19. *See* footnote 18, *supra.*

20. We do not suggest that the case law requires the suppression of every statement made to a health care worker who has a duty to disclose admissions about certain criminal activity to authorities in order to prevent future harm to third parties. As a threshold matter, we note that the applicability of the Fifth Amendment's government actor requirement to all those who have a duty to report certain criminal activity that comes to their attention is simply not implicated in this case. Here the district court found that the personnel of the Center took as one of their purposes the extraction of criminal admissions for the purpose of prosecution. We simply hold that, in this highly fact-specific case, the district

court was quite correct when it determined that the state, with an eye to prosecution, cannot coerce admissions under the guise of treatment and then prosecute on the basis of those admissions. More fundamentally, there is a quantum difference between the purposeful and coercive extraction of admissions for the purpose of prosecution and the simple reporting of information, whether because of a reporting requirement or a subpoena, which comes to the attention of the health care provider in the course of a legitimate, non-law enforcement encounter with a patient. This is the distinction that our colleagues in the other circuits have made in the cases we have discussed; we see no reason to depart from this settled principle.

absence of any comprehensive warning as to the full consequences of her disclosure, and the absence of any mention of her right against self-incrimination. On the basis of its analysis of the evidence, the district court came to the conclusion that D.F.'s inculpatory statements were not "the 'product of a rational intellect and free will.'" 857 F.Supp. at 1326 (quoting *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280–81, 4 L.Ed.2d 242 (1960)). We cannot say, given the standard of review to which we must adhere, that that conclusion is clear error. *Baldwin,* 60 F.3d at 365 (7th Cir.1995). Nor can we say that the district court was in error in its conclusion that the subsequent confessions of D.F. were inadmissible because they were the result of continued staff pressure. Although subsequent confessions are not necessarily tainted by an earlier confession, *see Oregon v. Elstad,* 470 U.S. 298, 310–11, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985), here the district court explicitly determined that the subsequent statements were the product of impermissible staff pressure.

### Conclusion

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.