BENTON, J.,
dissenting.
For the reasons that follow I would reverse the conviction and remand for a new trial.
I.
It is now well “recognize[d] that the government can exercise such control over a private actor that a ‘private’ action can fairly be attributed to the government for purposes of the ... *84 Fifth Amendment.” United States v. Garlock, 19 F.3d 441, 448 (8th Cir.1994). “Whether a private party should be deemed an agent or instrument of the Government for [Fifth] Amendment purposes necessarily turns on the degree of the Government’s participation in the private party’s activities, a question that can only be resolved ‘in light of all the circumstances.’ ” Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In conducting this analysis, “the ultimate question whether a private person is actually a government agent ... [is] a question that requires the application of a legal concept (agency) to facts.” United States v. Martin, 195 F.3d 961, 963 (7th Cir.1999). Employing the usual standard, this legal determination of agency is subject to de novo review on appeal. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
The evidence in the record established very clearly that the police initiated the process leading to the recording of Sabo’s conversations with Lawrence, that the police provided Lawrence with a tape recorder so she could record her conversations with Sabo, that the police did so for the purpose of furthering their investigation, and that the police used Lawrence as their surrogate in effecting the ends of their investigation. The trial judge’s conclusion that the “minimal” involvement of the police was insufficient to prove Lawrence was an agent of the police is not supported by the evidence.
The evidence proved that the only information the police had concerning the identity of the person who tampered with Lawrence’s vehicle was Lawrence’s suspicion that Sabo was involved. The police, however, did not contact Sabo. Instead, they decided to use Lawrence as the means of investigating Sabo’s involvement. To facilitate the police investigation, the detective instructed Lawrence, who had left her apartment and was staying with her mother, to move back into her apartment. There, the detective supplied Lawrence with a tape recorder, which he had obtained from the police department. He installed the recorder on her telephone and tested it by making calls to the police communication section. Initial *85 ly, he gave Lawrence six tapes, instructed her in the manner of recording, and told her to record conversations “that would be useful to [the] investigation.”
There is no conflict between Lawrence’s trial testimony and the detective’s. Lawrence testified that the detective knew Sabo had not contacted her after the accident and that the detective suggested she call Sabo to record his reaction to the accident. The detective testified, “I don’t remember whether I told her specifically not to call him or not.” After Lawrence had recorded several of her conversations with Sabo from her home telephone and delivered them to the police, the detective gave her an additional recording device for use on her telephone at her place of employment. Thus, the government instigated Lawrence’s activities and directed her use of the recorder for the specific purposes of eliciting admissions from Sabo.
This investigation to record Sabo’s conversations was the brainchild of the police. Lawrence had not contacted Sabo after her accident and had not been contacted by him. No evidence proved Lawrence was pursuing any private interest. Indeed, she moved back to her apartment, where she had access to her telephone, solely at the suggestion of the detective. In so doing and making the recordings, she was vindicating the interest of the government and functioning in the manner directed by the government.
Furthermore, the police removed any technical barriers that Lawrence may have encountered in locating or installing the equipment. The detective tacitly assured Lawrence that her conduct in recording the calls was lawful. By instructing Lawrence to initiate the first telephone call, the detective strategically set in motion the circumstance that generated return calls from Sabo to Lawrence. Cf. Corngold v. United States, 367 F.2d 1, 5-6 (9th Cir.1966) (noting that the government requested a private person to open a package in a particular person’s possession). Moreover, when the police supplied the recording equipment, installed the device, furnished the tapes, and instructed Lawrence to call Sabo, Law *86 rence needed only to activate the record button and talk to Sabo. “The fact that the Government has not compelled a private party to perform [the questioned act] does not, by itself, establish that the [act] is a private one.” Skinner, 489 U.S. at 615,109 S.Ct. 1402.
The notion that Lawrence was not acting as a government agent because Sabo later initiated telephone calls to her is fanciful in view of the detective’s initial direction to Lawrence to make the first call to Sabo. Although the detective told Lawrence to make the call to judge Sabo’s reaction, the inevitable and reasonably expected consequence of her telephone call was to initiate a dialogue with Sabo about the event that was the focus of the investigation. It is of minimal relevance to the inquiry that the detective told Lawrence not to initiate calls to Sabo after she made the initial call. When Lawrence followed the detective’s instruction to place the initial call to Sabo, she set in motion the desired circumstances to cause return calls. Lawrence already had informed the detective of the nature of her relationship with Sabo and of Sabo’s depression. Under those circumstances, who initiated the resulting calls after Lawrence made the first call has no bearing on the issue whether Lawrence was a government agent.
Likewise, the notion that Lawrence somehow was acting on a private venture when she recorded the conversations with Sabo is not supported by the evidence. The detective installed the recording equipment on Lawrence’s telephone. Thus, when Lawrence called to elicit conversation that she could record, she was acting well within the scope of the circumstances the detective set into motion. The detective made plain his preference for her initiation of the telephone dialogue. By telling Lawrence he wanted to get Sabo’s reaction to the accident, he also undisputedly manifested that this was a means of obtaining incriminating admissions from Sabo. Indeed, after Lawrence delivered tapes of her conversations with Sabo, the police gave her another recording device to use on the telephone at her place of employment. We held in Abunaaj v. Commonwealth, 28 Va.App. 47, 502 S.E.2d 135 *87 (1998), that a rape complainant who voluntarily made a telephone call to a suspect, which was recorded by the police, was acting in “compliance with police requests[, which] effectively made her an agent of the police.” Id. at 54, 502 S.E.2d at 139.
I would hold that this record contains clear and unequivocal evidence of the government’s “encouragement, endorsement, and participation” in Lawrence’s activity of eliciting admissions from Sabo and recording them. Skinner, 489 U.S. at 615-16, 109 S.Ct. 1402. This evidence was sufficient to prove she was a police agent and to implicate the Fifth Amendment.
II.
When the evidence proves that a private party has acted as a government agent in procuring evidence, the burden shifts to the government to prove the evidence was obtained by constitutionally permissible means. Debroux v. Commonwealth, 32 Va.App. 364, 371, 528 S.E.2d 151, 154 (2000). “It is without dispute that in Virginia the burden is upon the Commonwealth to prove that a confession is voluntary.” McCoy v. Commonwealth, 206 Va. 470, 474, 144 S.E.2d 303, 307 (1965).
The Fifth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. The admission of an involuntary confession violates due process. A confession will be found to be voluntary only if the government can demonstrate that, under the totality of the circumstances and by a preponderance of the evidence, it was not secured by the government through psychological or physical intimidation, but rather was the product of a rational intellect and free will.
United States v. D.F., 63 F.3d 671, 679 (7th Cir.1995) (emphasis added). The ultimate issue whether a statement is voluntary is a legal question. Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).
The principle is well established that a promise to withhold prosecution in exchange for a confession is the type of duress that renders a statement involuntary. See Hammer v. Com *88 monwealth, 207 Va. 135, 147-48, 148 S.E.2d 878, 885 (1966). Likewise, threats to interfere with an individual’s custody of a child as a means to elicit an admission will cause a confession to “be deemed not voluntary, but coerced.” Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). In addition, “sympathy falsely aroused” is a factor in determining whether an induced confession is involuntary. Spano v. New York, 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).
Lawrence testified that she “was after an admission” and worked hard to elicit an admission. To induce Sabo to make admissions, Lawrence told him she “would not bring in law enforcement if he gave an admission.” Lawrence testified that she was “giving [Sabo] an opportunity” to make an admission by promising not to pursue any criminal action. The tapes also disclose that Lawrence threatened to publicize her romantic affair with Sabo and threatened that the publicity could cause him to be “disbarred” and to lose his “political appointment.” She promised to withhold her actions if he talked to her and admitted tampering with her vehicle. Explaining her calls, she testified about her conversations with Sabo as follows:
I said, if this were to come out that you have done an illegal act, this could—like what we’re facing right now—this could affect his career. This could affect his political appointment. This could affect his visitation with his daughter.
Not that I wanted him to tell me that. But that if he told me what he had done, then I would go away, yes.
When Lawrence engaged in this activity, she knew Sabo had been diagnosed with depression and was taking medication to combat that illness. Pretending to be his confidant, she promised to “do whatever you need me to do to help you with this.” She promised Sabo that if he admitted tampering with her vehicle she would not pursue civil or criminal charges. She also promised not to carry through on the threats to damage his personal, employment, or political life. It is self-evident that “[t]he government may not do, through a *89 private individual, that which it is otherwise forbidden to do.” United States v. Feffer, 881 F.2d 734, 737 (7th Cir.1987).
I would hold that this evidence proved that Sabo’s admissions were obtained by duress, threats, and sympathy falsely aroused and, thus, failed to prove Sabo’s admissions were voluntary.
III.
I would also hold that the trial judge improperly excluded the testimony of Dr. Julian Brantley. While I agree with the majority opinion that portions of the proffered testimony of Dr. Brantley would have been improper, I disagree that all of Dr. Brantley’s testimony was inadmissible.
On the day of trial, the prosecutor challenged whether Dr. Brantley’s testimony was relevant to any issue at trial. In response, Sabo’s attorney argued that “[t]he issue for the Court at the suppression hearing was the admissibility of the statements to be made,” but that the issue remaining at trial was “the weight that [the statements] should receive.” He then informed the judge as follows:
Dr. Brantley would [testify] that ... [Sabo] said what he said because he was depressed. He was suffering from acute anxiety disorder.
And[,] he would testify as to the conditions that are accompanying those disorders, and that [Sabo] was overborne or more susceptible to being overborne than a normal person would have been.
After considering the arguments, the judge made the following ruling:
I don’t think Dr. Brantley can get up here and testify.
I’ve certainly heard his testimony from before, that because of [Sabo’s] condition what [Lawrence] said overbore his free will and therefore the statements were not made voluntarily.
I think I’ve already ruled on that as a matter of law. And I don’t think that it’s an appropriate subject before the jury.
*90 He made the statements. Certainly, there’s enough on those tapes from what I heard to indicate that it was not necessarily a spontaneous utterance.
During the trial, Sabo’s attorney made an additional proffer. The trial judge simply noted the proffer for the record.
Citing Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the Supreme Court of Virginia recently reaffirmed the principle that “[wjhile the [trial judge] has the duty to determine whether [a defendant’s] confession was voluntary, it is the jury’s duty to consider its reliability.” Pritchett v. Commonwealth, 263 Va. 182, 186, 557 S.E.2d 205, 208 (2002). Crane explicitly recognized the following principle:
“[Rjegardless of whether the defendant marshalled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any questions of voluntariness, a defendant’s case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.”
476 U.S. at 689, 106 S.Ct. 2142. Thus, the defendant is entitled to have the jury consider circumstances bearing upon the weight to be given to his or her confession and its reliability. Id. In particular, and as pertinent to this case, the Supreme Court noted in Crane that “the ... psychological environment that yielded the confession can ... be of substantial relevance to the ultimate factual issue of the defendant’s guilt or innocence.” Id.
In Pritchett, the Supreme Court held that a defendant is “entitled to introduce admissible evidence to assist the jury in determining whether the confession was reliable.” 263 Va. at 186, 557 S.E.2d at 208. Accordingly, the trial judge erred in ruling that because she had ruled on the issue of voluntariness, Dr. Brantley’s testimony was not “an appropriate subject before the jury.”
Furthermore, Dr. Brantley’s testimony at the suppression hearing and the proffer of his testimony establish that he was prepared to testify about Sabo’s depression and the manifesta *91 tions of his depression on his ability to function. “Expert testimony is admissible if the area of expertise to which the expert will testify is not within the range of the common experience of the jury.” Id. at 186-87, 557 S.E.2d at 208. Portions of Dr. Brantley’s testimony were offered particularly to explain to the jury the symptoms of Sabo’s illness and to explain that the illness would cause Sabo to exhibit poor judgment.
Dr. Brantley testified at the suppression hearing that he had treated Sabo in March and April of '1999 and that his diagnosis was that Sabo “has a chronic depressive illness which was typical of depression.” Dr. Brantley testified that Sabo’s “depressive illness was characterized by depressed mood, sad mood, despondent mood, feelings of worthlessness, helpless, hopelessness, a very pessimistic outlook for the future, difficulties maintaining concentration and feeling of— unrealistic feelings of guilt, extreme feelings of guilt, often unrealistic in this case, as well as suicidal ideation.” Dr. Brantley also said that “[a]s a symptom of his overall weakened state of mind, weakened by his depressive illness and anxiety, Mr. Sabo demonstrated to me impairments in his executive—what we call ego functioning. And poor judgement.”
In addition, Sabo’s attorney proffered at the suppression hearing that Dr. Brantley “would certainly testify that [Sabo] was more susceptible to being overborne and to making such an involuntary admission.” At the trial, he added to the proffer that Dr. Brantley “further, ... would say with a reasonable degree of medical certainty that at the time the conversation occurred and the tapes were made that Mr. Sabo was susceptible to being overborne by Miss Lawrence for the reasons that he articulated in the testimony and for the reasons made in the proffer.”
The testimony of Dr. Brantley concerned a matter that is beyond the normal province of a jury and was offered to explain to the jury Sabo’s mental illness. His testimony would have also given the jury an understanding of how Sabo’s *92 illness affected his susceptibility to the threats and intimidation. As the Court held in Pritchett, “an expert may testify to a witness’s or defendant’s mental disorder and the hypothetical effect of that disorder on a person in the witness’s or defendant’s situation.” Id. at 187, 557 S.E.2d at 208.
The error in not permitting the expert to testify concerning Sabo’s illness was not harmless error. Although Sabo attempted to describe his illness for the jury, his testimony did not have the same effect of an expert who could more accurately explain Sabo’s mental state and its effect on his functioning. Furthermore, while Sabo’s statement and characterization of his illness may have been viewed by the jury as self-serving, Dr. Brantley’s testimony and description of the illness would not have been so perceived and could have provided enhanced reliability for the jury to consider. Therefore, I would hold the judge committed reversible error in not allowing portions of Dr. Brantley’s testimony.
IV.
For these reasons, I would hold that Lawrence was acting as an agent of the police when she recorded her conversations with Sabo and, further, that the evidence failed to prove Sabo’s admissions were voluntary. In addition, I would hold that the trial judge erred in excluding Dr. Brantley’s testimony. Accordingly, I would reverse the conviction and remand for a new trial.