**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD EDWARD BEATY,
       *Petitioner-Appellant,*

v.

DORA B. SCHRIRO, Director,
Arizona Department of
Corrections,
       *Respondent-Appellee.*

No. 05-99013

D.C. No.
CV-92-02076-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
May 14, 2007—San Francisco, California

Filed November 28, 2007

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge O'Scannlain

15229

**COUNSEL**

John E. Charland, Phoenix, Arizona, argued the cause and filed briefs on behalf of the petitioner-appellant. Jon M. Sands, Federal Public Defender, Phoenix, Arizona, and Dale A. Baich, Assistant Federal Public Defender, Phoenix, Arizona, were also on the briefs.

John Pressley Todd, Assistant Attorney General of Arizona, Capital Litigation Section, Phoenix, Arizona, argued the cause and filed a brief on behalf of the State of Arizona. Terry Goddard, Attorney General of Arizona, Phoenix, Arizona, and Kent Cattani, Chief Counsel, Capital Litigation Section, Phoenix, Arizona, were also on the brief.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We previously remanded this capital habeas appeal to the district court with instructions to conduct an evidentiary hearing on whether Petitioner's inculpatory statements to a prison psychologist were voluntary within the meaning of the Fifth Amendment. We must now decide whether the district court erred in subsequently concluding that such statements were constitutionally voluntary and therefore properly admitted at Petitioner's trial.

I

A

Donald Edward Beaty was convicted in Arizona state court for the murder and sexual assault of thirteen-year-old Christy Ann Fornoff. The facts surrounding this crime were detailed in our previous opinion:

On May 9, 1984, thirteen-year-old Christy Ann Fornoff disappeared at a Tempe, Arizona apartment complex while making collections for her newspaper route. Donald Beaty, a maintenance person for the complex, actively assisted the police in searching for Fornoff. Although the police located her collection book near the complex, she was nowhere to be found.

In the early morning of May 11, Joseph Kapp, a tenant, encountered Beaty while throwing out his trash. Beaty told Kapp that he had found a body behind the dumpster and that he had called the police. Kapp observed the body, spoke with Beaty for a few minutes, and then returned to his apartment. The police later arrived and determined that the body was Fornoff's. A medical examiner concluded that Fornoff had been asphyxiated by smothering and that she had been sexually assaulted, either contemporaneously with or shortly after her death. The examiner also opined that she had died within two hours of her disappearance.

The police focused their investigation upon Beaty. Vomit smeared on the body matched a substance found in Beaty's closet. The blood, semen, and hair found on the body was consistent with Beaty's. Hair found on Beaty's closet carpet, couch, bedroom, and bathroom was consistent with Fornoff's. Fibers found on the body matched Beaty's carpet and a blanket in his bedroom. Ferret hair was found on the body; the tenant who lived in Beaty's apartment a few months prior to the murder owned a ferret.

Police records showed that Beaty had called the police at 5:52 a.m. According to Kapp, he had returned to his apartment at 5:50 a.m. The timing suggested that Beaty had lied to Kapp about having

called the police. The police also speculated that Beaty had moved the body after speaking with Kapp. Robert Jark drove his truck in front of the dumpster at approximately 4:50 that morning. As with Kapp, Jark was sure that a body was not visible from in front of the dumpster. However, when the police arrived, the body stuck out noticeably beyond the dumpster's edge.

Beaty told police that he was with George Lorenz, a tenant, at the time Fornoff disappeared, and that Teresa Harder, another tenant, saw them together. However, Lorenz denied being with Beaty that night, and Harder similarly denied seeing them together. Beaty also claimed that the police had searched his apartment the night Fornoff disappeared. However, the two officers who searched the complex claimed that they did not enter Beaty's apartment. Finally, the police found it suspicious that Beaty had attempted, unsuccessfully, to borrow a friend's car at 11:30 p.m. the night after Fornoff disappeared. The police speculated that Beaty wanted to borrow a car to move the body.

On May 21, 1984, Beaty was arrested and charged with Fornoff's murder and sexual assault.

*Beaty v. Stewart*, 303 F.3d 975, 980-81 (9th Cir. 2002) (hereinafter *Beaty I*) (footnote omitted).

B

After his arrest, Beaty was incarcerated at the Maricopa County Jail ("the main jail"). He initially was classified as a "high-risk" inmate because he appeared depressed and distraught over his arrest and his family's reaction to his arrest. As a high-risk inmate, Beaty was visited by a staff psychiatrist who was to perform an intake evaluation. That staff psy-

chiatrist was Dr. George O'Connor, who spoke with Beaty for about an hour and decided that he was not suffering from a serious psychological condition. *Id.* In addition, Dr. O'Connor learned that Beaty had a painful foot condition. In late August 1984, Beaty was transferred to the Durango Psychiatric Unit ("Durango") on the recommendation of Dr. O'Connor. As we previously noted, this transfer served three purposes: (1) Beaty needed space to rehabilitate his injured foot; (2) Durango offered a safer place for Beaty because it was isolated from the jail's general population; and (3) Beaty was becoming increasingly agitated and depressed and undertook a hunger strike. *Id.* at 981.

At Durango, inmates were encouraged to participate in some type of therapy, and both group therapy or one-on-one therapy were provided. When an inmate transferred into Durango, the staff worked with the inmate to develop a treatment plan tailored for that particular inmate; the resulting document was treated as an agreement by the inmate to fulfill the obligations contained in the treatment plan.

The staff at Durango developed a coed therapy group as an experiment to improve the relationship between male and female inmates. Beaty was asked to participate in this group, and he agreed.[1] The coed therapy group was led by Dr. O'Connor and by Lily Epler, an intern and graduate student at the University of Arizona. At the first meeting of the group, on Thursday, November 15, 1984, Beaty and the other inmates signed a document entitled "Interpersonal Relationships Group Contract" ("IPG contract"), which provided in relevant part: "I understand that all group communication is confidential and therefore group business cannot be discussed outside of group. Only in this way can I feel free to express my feelings."

---

[1]Although there is a dispute over how and why Beaty was chosen to participate in such an experimental group, the district court found that his participation in the Tuesday/Thursday group was voluntary, and that finding is not clearly erroneous.

During the group's second meeting, Beaty became agitated after a discussion of his alleged crime was raised by another participant (a female juvenile in the group named Sherry). Beaty felt that he was being verbally attacked and that discussion of his crime was outside the scope of the group's goals. He approached Dr. O'Connor when the group session ended and, after waiting in line while others spoke to Dr. O'Connor, finally was able to get Dr. O'Connor alone. Beaty testified that he conveyed to Dr. O'Connor that he "was upset that my case got brought up when it was my understanding that the group was supposed to be about relationships." He stated that he never told Dr. O'Connor anything about his alleged crime or about the victim.[2]

Dr. O'Connor's memory of their conversation paints a starkly different picture. Dr. O'Connor stated that Beaty was extremely agitated during this conversation and stated that "he was not a terrible person and did not mean to kill Christy Fornoff." Dr. O'Connor testified that Beaty used, along with these words, hand motions ("gestalt") to indicate that he only intended to muffle the girl's mouth. Dr. O'Connor testified that the clear message he took away from this altercation was that Beaty "had done it." Immediately after Beaty made the statement, Dr. O'Connor, who was in a rush to leave, extricated himself from the therapy room. Dr. O'Connor testified that the statement made him uncomfortable.

Beaty attended the next meeting of the coed group but, according to his testimony, he decided to quit after he felt he was unfairly attacked again. There is a dispute over what prompted his transfer from the Durango facility, but it is undisputed that Beaty was returned to the main jail on Thursday, November 29, 1984. The district court suggested that

---

[2]Although Beaty contends that he never confessed to Dr. O'Connor, he may still argue that the confession, which was introduced at his trial, was coerced within the meaning of the Fifth Amendment. *See Lee v. Mississippi*, 332 U.S. 742, 745 (1948).

such transfer was likely in preparation for his first trial, which was slated to begin in mid-December and explicitly concluded that Beaty was not transferred "as a punishment for quitting the coed group."

## C

Dr. O'Connor did not immediately disclose Beaty's inculpatory statements and gestures to anyone, and Beaty's case proceeded to trial. The state's case rested primarily on the physical evidence tying Beaty to the crime. On March 18, 1985, the trial court declared a mistrial after the jury deadlocked ten to two in favor of guilt. As we recounted in *Beaty I*:

> On May 8, 1985, Beaty's second trial commenced. Two days later, O'Connor went to state court to testify in an unrelated case. While waiting to testify, O'Connor spoke casually with a detention officer. During the course of the conversation, O'Connor disclosed Beaty's confession. The prosecution quickly learned about the conversation and contacted O'Connor. [He] refused to testify but, after an evidentiary hearing, the trial court ordered him to do so.

> During the second trial, the state presented much of the same evidence as it had offered at the first trial, but with the addition of O'Connor's testimony. The jury unanimously found Beaty guilty of first degree murder and sexual assault. The judge thereafter conducted a sentencing hearing without a jury. The judge imposed the death penalty after finding one aggravating circumstance and no mitigating circumstances.

303 F.3d at 982-83.

After the conclusion of his state review, Beaty filed a habeas petition under 28 U.S.C. § 2254. The district court ini-

tially rejected all of Beaty's claims and denied his petition, but granted a certificate of probable cause allowing Beaty to appeal.

On appeal, we declined to issue a Certificate of Appealability ("COA") on nearly all of Beaty's claims. *Beaty I*, 303 F.3d at 994. As to Beaty's claims surrounding the admission of his confession to Dr. O'Connor, we rejected outright Beaty's claim that he was entitled to *Miranda* warnings prior to his participation in the group because we concluded that Beaty's admission was spontaneous and not the result of interrogation. *Id.* at 991. We also declined to issue a COA on Beaty's claim that the admission of O'Connor's testimony violated his Sixth Amendment right to counsel. *Id.* at 991-92.

We concluded, however, that a COA should be granted with respect to Beaty's claim that his statement to Dr. O'Connor was involuntary under the Fifth Amendment. We reasoned that the record was not fully developed as to "the reasonableness of Beaty's asserted belief that his statements were protected by the terms of the agreement, taking into account the circumstances surrounding Beaty's statements to O'Connor and the group discussion preceding this encounter." *Id.* at 993. "In light of the grave consequences at stake, [we believed] that an evidentiary hearing on this issue before the district court [was] necessary." *Id.* We therefore remanded the appeal to the district court with instructions to conduct an evidentiary hearing and to determine whether Beaty's belief that his statements were confidential was reasonable. *Id.* at 994.

D

The district court held an evidentiary hearing on Beaty's voluntariness claim from October 19-21, 2004. During this hearing, the court heard testimony regarding the coed group therapy of which Beaty was a part. Witnesses at the hearing included (1) Dr. O'Connor; (2) Beaty; (3) a mental health expert called by Beaty (Dr. Overbeck); (4) three members of

the coed therapy group (Lisa Valandingham, Donald Guyer, and Geraldine Nosie); (5) two other jail psychiatrists at the Durango facility (Dr. Potts and Dr. Garcia-Bunuel); and (6) a jail counselor (Thomas Haines).

In June 2005, the district court issued a Memorandum of Decision and Order denying Beaty's claim that his confession was involuntary under the dictates of the Fifth Amendment. The court concluded that "the attendant circumstances of Petitioner's confession discredit the reasonableness of his assertion that the contract was an unqualified promise of complete confidentiality." It also concluded that even assuming a limited promise of confidentiality, such a promise did not cause Beaty to confess and did not overbear his will against self-incrimination. In addition, the district court declined to consider Beaty's *Miranda* claim, ruling that the previous decision in *Beaty I* foreclosed the issue.

Beaty filed a timely notice of appeal.

## II

## A

We think it important to note at the start that the circumstances of this case are hardly typical of situations in which questions about the voluntariness of a confession arise. As the Seventh Circuit has stated in a similar context, "[t]his case, unlike so many others that we see in the course of our work, does not involve formal police interrogation in a government facility dedicated to law enforcement work. Nor does it involve the usual face-to-face confrontation between law enforcement officers and the defendant." *United States v. D.F.*, 115 F.3d 413, 419 (7th Cir. 1997) (*D.F. II*). Instead, this case involves the interaction between an inmate and a prison psychiatrist, the degree to which there were promises of confidentiality between the two, and the degree to which any such promises overbore the inmate's will to avoid self-

incrimination. The difficulty of this case thus lies in the need to apply our well-settled law on voluntariness to a unique factual situation.

[1] The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. We have interpreted this proposition to mean that an inculpatory statement is voluntary "only when it is the product of a rational intellect and a free will." *United States v. Leon Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Id.* at 1366 (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).[3]

[2] In other words, a statement may be considered involuntary if it is "extracted by any sorts of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto*, 429 U.S. at 30 (internal quotation marks omitted). But the breadth of this rule is circumscribed by the requirement that "[t]he promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *Leon Guerrero*, 847 F.2d at 1366 (citing *Hutto*, 429 U.S. at 30).

---

[3]Importantly, the voluntariness test does not ask whether the suspect would have given the statement "but for" the government conduct. As we noted in *Leon Guerrero*:

> Causation, including but-for causation, has never been the test for voluntariness. *Hutto v. Ross*, 429 U.S. [28,] 30 [(1976) (per curiam)]. If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 224-25 (1973).

847 F.2d at 1366 n.1.

B

Beaty contends that, in discussing his case with Dr. O'Connor, he reasonably relied upon the State's promise of confidentiality contained in the IPG contract. He argues that he followed the "letter and spirit" of the contract by not revealing group communication and by being candid with the group psychiatrist. Beaty points to our decision in *Pens v. Bail*, 902 F.2d 1464, 1465 (9th Cir. 1990) (per curiam), as support for his argument that when a psychiatrist promises confidentiality to facilitate a discussion of a prisoner's problem, anything said by the prisoner to the doctor is inadmissible. In his view, the district court erred in distinguishing *Pens* on the basis that the defendant in that case was undergoing compulsory counseling, whereas Beaty was voluntarily participating in the group; he argues that even assuming that participation was voluntary, he was induced to participate in the group by the promise of confidentiality. Beaty also argues that the promise contained in the IPG contract was not contingent and that the only reasonable interpretation is that group business could not be discussed outside the group by anyone. He therefore asks us to conclude both that the conversation with Dr. O'Connor was in fact confidential and that his confession was induced by this promise of confidentiality.

The State of Arizona contends that, in order for his confession to be suppressed, Beaty needed to establish (1) coercion (2) by the State, which (3) caused his will to be overborne. In their view, Beaty did not establish *any* of these elements at the evidentiary hearing, let alone all of them. In particular, the State points out that the district court found, as a matter of fact, that Beaty's relationship with Dr. O'Connor was not intended to elicit a confession or to induce him to confess. The State also notes that the district court found that "[t]he facts show that the promised confidentiality did not reasonably extend to Petitioner's conversation with Dr. O'Connor after the group therapy session had ended." Thus, in the State's view, the district court correctly held that there existed

no coercive promise from the State. Moreover, Arizona argues that even if either Beaty's relationship with the doctor or the group contract *was* classified as a coercive promise, such promise did not overbear Beaty's will.

## C

In *Beaty I*, 303 F.3d at 993, we remanded to the district court for an evidentiary hearing on the "critical question . . . whether Beaty reasonably believed that his statements were protected by the state's confidentiality agreement." On remand, the district court found, as facts, that Beaty made his statements to Dr. O'Connor outside the group communications that were the subject of the confidentiality agreement, and thus outside the limited promise of confidentiality, and that he confessed spontaneously after seeking out Dr. O'Connor, rather than in response to questioning. The district court simply did not believe Beaty when he testified that he thought that the contract was across-the-board and when he claimed that he had a close "nurturing" relationship with Dr. O'Connor.

The district court started by examining the IPG contract and stating that it was reasonable to interpret it as applying to a conversation with Dr. O'Connor outside the group, immediately following a session. But then the court went into detail about what actually happened and found—applying specific facts to that theoretical construct—that "the attendant circumstances of Petitioner's confession discredit the reasonableness of his assertion that the contract was an unqualified promise[ ] of complete confidentiality." In other words, although the district court acknowledged that in theory Beaty's belief could have been reasonable, in fact his belief, even if genuine, was not reasonable because of the surrounding circumstances.[4] We agree.

---

[4]We review for clear error the district court's factual findings. *United States. v. Wolf*, 813 F.2d 970, 974 (9th Cir. 1987). Nevertheless, " 'the ultimate issue of "voluntariness" is a legal question . . . .' " *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985)).

First, the scope of the IPG contract is not as broad as Beaty would have it. As the district court noted, by its terms, the promise of confidentiality applies only to "group" communications. Beaty himself testified that he understood the contract to mean "we couldn't go back into our pods and discuss what was in — what we talked about in the group." He further stated that the remedy for breaching this group confidentiality "was never discussed. We were just told not to go back into the pods and talk about group business."

**[3]** In other words, the contract extended only to what was talked about amongst the group. It did not serve to establish a full patient-physician privilege and did not guarantee complete confidentiality for any statement made by Beaty, however unrelated it might have been to the group. And further, during a discussion of the contract in the group, participants were told that it meant they could not go back to their pods and discuss group business; at no point were they told that they were assured complete confidentiality for any and all statements that they made. In this situation, the lack of clear, broad language extending the promise of confidentiality outside the confines of the group session, and the lack of any such broad promise by the therapists running the group, support the district court's conclusion that Beaty could not have relied upon the contract itself to establish a reasonable belief in confidentiality.[5]

**[4]** Second, there was a window of time between the end of the group session and Beaty's statement. According to Beaty's own testimony at the hearing, he waited patiently with his knee on a chair while another inmate spoke with Dr. O'Connor. When that conversation ended, Beaty approached

---

[5]Indeed, we note that a similar conclusion was reached many years ago by the Arizona Supreme Court, which held that Beaty's "inculpatory statements were not regarding group business nor were they given during the group session. The statements were not induced or coerced by defendant's membership in the group." *State v. Beaty*, 762 P.2d 519, 527 (Ariz. 1988).

Dr. O'Connor as he was in the process of putting some paper-work in a satchel. It is not disputed that it took at least five minutes, and perhaps as long as 15 minutes, from the end of the group session to the time that Beaty began to speak with Dr. O'Connor. This lapse in time supports the conclusion that the "group session" had ended; that any alleged "mandatory" attendance requirement had ended; and that any statements made by Beaty were not necessarily group communication. Further, the fact that Beaty waited to be alone with Dr. O'Connor before making his statement indicates that Beaty himself did not believe this was the type of conversation he would share with the group; in other words, it was not "group communication." Thus, the reasonableness of Beaty's belief that his statement fell within the scope of the "group" contract is diminished both by the significant lapse in time from the end of the group and from Beaty's desire to speak with Dr. O'Connor outside the group context.

**[5]** Relatedly, inmates were told that they should not dis-cuss their crimes with the staff, especially during the group session. At oral argument, Beaty's counsel emphasized that Beaty was attempting to follow the directive of Drs. O'Connor, Potts, and Garcia not to talk about his crime in the group when he approached Dr. O'Connor well after the ses-sion ended. Yet at the same time, Beaty claims that his incul-patory statement constituted group business and thus fell within the confidentiality parameters of the IPG contract. There is clear internal tension in this argument; if Beaty were attempting to follow the directive of Durango staff when he approached Dr. O'Connor, such action discredits the reason-ableness of his belief that the IPG contract *itself* would cover communications regarding Beaty's crime.

**[6]** The reading of the IPG contract's confidentiality provi-sion offered by Beaty at the evidentiary hearing is, quite sim-ply, unlimited in scope. And although the district court entertained the possibility that Beaty's belief was reasonable in the abstract, it ultimately determined that such a broad,

unlimited reading of the scope of the contract was not reasonable in the context of these facts. We agree with the district court that, under the attendant circumstances, Beaty's belief in the unlimited nature of the IPG contract's confidentiality provision was not reasonable.

D

The district court also concluded that even if the IPG contract could be viewed as a limited "coercive promise," it did not in this case overcome Beaty's will against self-incrimision. In reaching this conclusion, Beaty contends that the district court erred in distinguishing his confession from those suppressed as involuntary in *Leyra v. Denno*, 347 U.S. 556 (1954), and *Pens*, 902 F.2d at 1465. We agree with the district court that any promise that might have existed did not rise to the level of overcoming Beaty's will.

In *Leyra*, the petitioner's aged parents were found murdered. 347 U.S. at 558. Suspicion quickly focused on Leyra and he was subjected to repeated interrogations, including full days and nights of questioning. During one such all-night questioning, Leyra complained of a sinus attack. The police arranged for a doctor to provide medical relief, but, in reality, the doctor "was not a general practitioner but a psychiatrist with considerable knowledge of hypnosis." *Id.* at 559.

> For an hour and a half or more the techniques of a highly trained psychiatrist were used to break petitioner's will in order to get him to say he had murdered his parents. Time and time and time again the psychiatrist told petitioner how much he wanted to and could help him, how bad it would be for petitioner if he did not confess, and how much better he would feel, and how much lighter and easier it would be on him if he would just unbosom himself to the doctor.

*Id.* at 559-60. The Supreme Court reversed the denial of Leyra's habeas corpus application, holding "that use of confessions extracted in such a manner from a lone defendant unprotected by counsel is not consistent with due process of law as required by our Constitution." *Id.* at 561.

Beaty's attempts to analogize his case to *Leyra* are unavailing. *Leyra* involved repeated interrogation, sleep deprivation, and trickery. In *Beaty I*, we held in the *Miranda* context that no custodial interrogation occurred in this case. In addition, unlike in *Leyra*, where the deceptive use of the psychiatrist was clearly *intended* to elicit a confession, we previously noted that "[t]he factual record clearly reveals that the group sessions were not deliberately designed to elicit incriminating remarks. The purpose of the group was to explore interaction between male and female inmates. The group was not organized to collect incriminating information to be used at trial." *Beaty I*, 303 F.3d at 991; *see also id.* at 992 ("The group sessions were not court-ordered and were not designed to acquire information to be used at trial."). The type of "overreaching" police or state conduct which was present in *Leyra* is simply absent in this case. *See Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (noting that "the [voluntariness] cases considered by this Court . . . have focused upon the crucial element of police overreaching").

*Pens* is distinguishable on similar grounds. Pens was convicted on two counts of first-degree rape and committed to the Western State Hospital (WSH). The treating therapists assured Pens that "information he revealed during treatment would not be disclosed to the courts." Pens thereafter confessed to additional attempted and completed rapes. After three years, WSH returned Pens to court along with a report detailing the confessions and concluding that he was not safe to be at large. The Ninth Circuit reasoned that "Pens was committed under court order to a psychiatric treatment program at a locked state facility. Full confession and cooperation were represented as necessary for successful treatment

and eventual release." 902 F.2d at 1465. Thus, the court concluded the confession was involuntary and improperly formed the basis for an exceptional sentence.

But here, as discussed above, Beaty was never assured of complete confidentiality for any statements he made, nor was he told that information revealed to Dr. O'Connor "would not be disclosed to the courts." In addition, Beaty was not committed to the mental ward by the state, but instead sought out a transfer to Durango and voluntarily participated in counseling. *Beaty I*, 303 F.3d at 992 ("The group sessions were not court-ordered and were not designed to acquire information to be used at trial."). Whereas in *Pens*, "[f]ull confession and cooperation were represented as necessary for successful treatment and eventual release," 902 F.2d at 1465, no similar quid pro quo was established here. Beaty's treatment was largely incidental to his incarceration and his cooperation in the treatment program was by no means a prerequisite for his eventual release. Moreover, Beaty agreed that it was his decision to remain behind after the group ended and that no one forced him to speak to Dr. O'Connor. Thus, there is no reason to doubt the district court's conclusion that any "coercive" aspect of Beaty's treatment program was not the cause of his confession.[6]

---

[6]This deficiency also distinguishes *Fulminante*, where the Supreme Court deemed involuntary a statement made by a prisoner to his cellmate, a government agent. The government agent/cellmate promised to protect Fulminante from "credible threats of violence" if he confessed his crime. 499 U.S. at 288. The court found that such an agreement, considered in light of the fact that Fulminante could be hurt or killed without protection, had overborne his will against self-incrimination. *Id.* The promise here was not coercive as it was in *Fulminante*: Beaty did not face specific threats of violence at the main jail and, even if he did, Beaty was not presented with the stark choice either to confess or to be sent back to that jail. At most, Beaty was asked to participate passively in the group, and perhaps to discuss his feelings about personal relationships, which is a far cry from being coerced to confess. Moreover, the district court found as a matter of fact that participation in the coed group was voluntary and that Beaty was *not* transferred back because of his refusal to participate in the group. *See infra* at III.B.

Finally, the Seventh Circuit's decision in *D.F.*, although it may present the closest analogy in existing case law, is also distinguishable. In *D.F.*, the defendant, a juvenile girl, was admitted against her will by her aunt and legal guardian to the county mental health facility after two of her infant cousins were found dead in the span of a week. *United States v. D.F.*, 63 F.3d 671, 673 (7th Cir. 1995) (*D.F. I*). The defendant had a history of assaultive behavior and drug and alcohol abuse; there was also evidence that she had suffered physical and sexual abuse during her childhood. While at the facility, D.F., then 14 years old, participated in a group therapy session. At one session, D.F. "spontaneously told the group that she had killed her cousins." *Id.* at 675. The district court suppressed the statements, ruling:

> After considering the totality of the circumstances, I conclude that D.F.'s inculpatory statements were secured through psychological coercion and were not the "product of a rational intellect and free will." cir- circumstances under which they were employed, the various "encouragement" techniques employed by the staff were highly coercive. A reasonable person of D.F.'s age, intellect, and mental state would have felt coerced.

*Id.* at 676 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)) (internal citation omitted).

The Seventh Circuit affirmed, concluding that the "district court's findings of historical fact were solidly rooted in the record." *D.F. II*, 115 F.3d at 421.[7] The critical finding of fact fatal to Beaty's analogy is that in the *D.F.* case,

---

[7]In *D.F. I*, the Seventh Circuit reviewed the district court's decision under a clear error standard of review. 63 F.3d at 677. After that decision was vacated by the Supreme Court in light of *Ornelas v. United States*, 517 U.S. 690 (1996), the Seventh Circuit adhered to its earlier reasoning under a de novo standard of review in *D.F. II*, 115 F.3d at 421.

> Staff at the Center went to great lengths to encourage and develop her trust. They also employed a wide range of tactics to "encourage" her to talk about the crimes she had committed. Privileges were accorded based on, among other things, frank admission of crimes. Criminal admissions were forgiven subject to continued cooperation and disclosure. Individual staff questioned D.F. directly about her past crimes. Protective Services Staff were provided with information about her crimes, and were allowed to question her about further crimes.

*Id.* No similar findings of fact were made here by the district court; indeed, the district court's findings of fact are to the contrary. The district court concluded that "neither the contract nor Dr. O'Connor asked Petitioner to reveal anything potentially inculpatory;" Beaty waited 5 to 10 minutes to talk to Dr. O'Connor, during which time he was free to leave; Dr. O'Connor's conduct *within* the coed group did not coerce Beaty's statement; Dr. O'Connor did not bring up Beaty's charges, other group members did; Beaty was asked to volunteer for the group, and not forced to join; Beaty was discouraged from discussing his crimes in the group; and Beaty was a relatively high-functioning inmate who, his own expert testified, had I.Q. scores that were "average to superior."[8] Unlike in *D.F.*, therefore, the structure of treatment did not encourage confessions, no rewards were gained from confessions, criminal admissions were not forgiven, and Beaty was not forced to participate.

---

[8]The district court made additional findings of fact regarding Beaty's mental functioning. In particular, the district court considered evidence from Dr. Overbeck about a hemisphere discrepancy in Beaty's brain which might make him more susceptible to coercive tactics. The district court noted nonetheless that not only were Beaty's IQ scores above average but that, during his testimony at the evidentiary hearing, Beaty appeared poised, alert, and articulate.

In addition, although the *D.F.* court acknowledged that prison counselors could be considered "law enforcement surrogates," they emphasized that any questioning "must be of a nature that reasonably contemplates the possibility of criminal prosecution." *D.F. I*, 63 F.3d at 683. Whereas in *D.F.* the "[s]taff members at the Center were either enlisted or volunteered to act as law enforcement surrogates in eliciting confessions from troubled teens," *D.F. II*, 115 F.3d at 420, no similar relationship has been established here between the police and the staff at Durango. Indeed, Dr. Potts, Dr. Garcia-Bunuel, and Dr. O'Connor all testified that discussion of criminal activities was not part of their group therapy process; and as we previously stated, "[t]he factual record clearly reveals that the group sessions were not deliberately designed to elicit incriminating remarks." *Beaty I*, 303 F.3d at 991.

[7] In short, considering the district court's findings of facts, we conclude that Beaty's will against self-incrimination was not overborne by the limited promise of confidentiality contained in the IPG contract.

E

[8] In conclusion, we agree with the district court's determination that Beaty's reliance upon the IPG contract to protect the confidentiality of his confession was not reasonable given the surrounding facts and circumstances. We also agree that any promise that existed, whether in the form of a contract or a relationship, was not sufficiently compelling or coercive to have overborne Beaty's will against self-incrimination. Accordingly, Beaty's inculpatory statement was voluntary within the meaning of the Fifth Amendment and therefore properly admitted at his second trial.

III

There are two additional issues that we must resolve with respect to Beaty's voluntariness claim. In *Beaty I*, we reserved

judgment and left for the district court Beaty's arguments that his statements were involuntary (1) because he was coerced by his fellow group members and (2) because he was forced to participate in the group sessions. 303 F.3d at 994 n.11.[9] The district court addressed these contentions on remand and determined that neither of Beaty's arguments merited habeas relief.

## A

Beaty first claims that his statement was involuntary because it was coerced by his fellow group members. The district court rejected this contention because it found a lack of state action that was reasonably likely to illicit a confession. *See Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). First, the district court concluded that Dr. O'Connor was not the person who brought up Beaty's charges in the group. As discussed above, a juvenile member of the group attacked Beaty as being a "very unfeeling person." According to Beaty's own testimony, "either Dawn or Sherry," not Dr. O'Connor or Lily Epler, brought up his charges initially. Thus, the district court's factual finding that it was not a state actor who initiated the discussion of Beaty's "unfeeling nature" and his crime was not clearly erroneous.

Further, as we stated in our previous opinion in another context, "[t]he factual record clearly reveals that the group sessions were not deliberately designed to elicit incriminating remarks. The purpose of the group was to explore interaction

---

[9]We also reserved judgment in our original disposition on Petitioner's claim that the decision in *Ring v. Arizona*, 536 U.S. 584 (2002), applies retroactively to habeas proceedings. *Beaty I*, 303 F.3d at 994 n.12. Because that issue has been determined conclusively by the Supreme Court to Beaty's disfavor, *see Schriro v. Summerlin*, 542 U.S. 348 (2004) (holding that the rule of *Ring* does not apply to death penalty cases already final on direct review), we need not address it.

between male and female inmates. The group was not orga-
nized to collect incriminating information to be used at trial."
*Beaty I*, 303 F.3d at 991. Nothing said or introduced at the
evidentiary hearing undermines our conclusion. This stands in
stark contrast to other cases, such as *D.F.*, where a confession
was deemed involuntary. In *D.F.*, the staff at the treatment
facility "employed a wide range of tactics to 'encourage' her
to talk about the crimes she had committed." *D.F. II*, 115 F.3d
at 421. Furthermore, privileges were accorded based on the
frank admission of crimes and such admissions were forgiven
subject to continued cooperation and disclosure. *Id.* In this
case, no such state action existed during the group sessions or
in their formation. Indeed, at the evidentiary hearing, all staff
members who testified agreed that inmates were not encour-
aged to discuss their crimes in the group.

[9] Based upon these findings, we agree with the district
court that there was insufficient state action on the part of the
group participants sufficient to render Beaty's statement
involuntary.

B

Beaty next argues that his confession was involuntary
because he was forced to participate in the group under threat
of being returned to the main jail. The district court concluded
that Beaty was not forced to participate in the coed group
therapy. In addition, the court noted that Beaty's transfer to
the main jail was not a result of his withdrawal from the ther-
apy group. Indeed, it found, as a matter of fact, (1) that Beaty
never told anyone he planned to quit the group, and (2) that
Beaty was transferred from Durango *prior* to the time of the
fourth group session (which would have been his first missed
session). Thus, the court concluded that Beaty's transfer to the
main jail was unrelated to his personal decision not to partici-
pate any further in the coed therapy group. We discern no
clear error in these findings. *See Lambert v. Blodgett*, 393
F.3d 943, 964 (9th Cir. 2004) ("Factual findings and credibil-

ity determinations made by the district court in the context of granting or denying the [habeas] petition are reviewed for clear error.").

Of the witnesses who testified at the evidentiary hearing, only Beaty claimed that he was affirmatively compelled to participate in the group. The district court failed to credit Beaty's testimony, instead accepting the testimony of the other witnesses, who testified at the evidentiary hearing that they were *asked* to participate in the group, not forced to participate.

**[10]** One witness, Geraldine Nosie, testified that she could have chosen not to participate in the group if she wanted and noted that "it was a trial group and, basically, I guess they were just selecting people that they felt should be there." She further testified that she "probably begged, cried, and whined to get in to the group." Another group member who testified, Lisa Valandingham, stated that she was not required to join the group and was not punished when she finally decided to drop out of the group. Finally, Donald Guyer, another group member, stated that he didn't "recall feeling that I was compelled." He further testified "there was no compulsion. I didn't have to. I wasn't told I had to go there or I'd have to leave the [Durango] facility." The district court's decision to credit the testimony of these witnesses over Beaty's was not clearly erroneous. Thus, because there was no compulsion by the state to participate in the coed group, the district court did not err in concluding that his participation in the group was not itself coercive.

Moreover, even assuming that Beaty harbored a subjective belief that his participation in the coed therapy group was mandatory to avoid being sent back to the main jail, this case is unlike *Fulminante* because in that case, "[t]he Arizona Supreme Court found a credible threat of physical violence unless Fulminante confessed." 499 U.S. at 287. *Fulminante*'s finding of involuntariness was premised on the idea that "it

was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess." *Id.* at 288. But as *Fulminante* also makes clear, fear in the abstract was not enough; the threat of physical violence had to be real and imminent to constitute improper coercion. The Arizona state courts made no finding here regarding the credibility of threats of violence, and there is nothing in the record that suggests "credible" threats were made against Beaty. Moreover, participation in the group cannot be equated with a requirement of confession. Accordingly, *Fulminante* cannot control.

## IV

Finally, we address Beaty's extensive *pro se* filings, which purport to be: (1) an application to file a second or successive petition for habeas relief under 28 U.S.C. § 2254 (including a motion, buried in a footnote, to appoint capital counsel), filed May 21, 2007, and (2) "Motion for a Procedural Order; Motion for Reconsideration; and/or Motion for En Banc Review," filed July 18, 2007. Although originally filed under a new case number, such number was later terminated and these filings were erroneously docketed with the instant appeal.

We ordered Beaty's counsel of record to explain these voluminous filings. In response, he provided a procedural history of Beaty's travails in state and district court but failed to explain the filings. Instead, counsel invited us to "appoint counsel to brief the issues presented by Beaty in his application." However, the purported application under 28 U.S.C. § 2244(b)(3)(A) fails to conform with Ninth Circuit Rule 22-3, which governs such applications. In particular, Beaty fails to comply with Rule 22-3(a)(2), which requires him to "state as to each claim presented whether it previously has been raised in any state or federal court and, if so, the name of the court and the date of the order disposing of such claim(s)." Many of the claims made by Beaty in his purported applica-

tion have been repeatedly raised and rejected below, yet he makes no effort to comply with our requirement that he state each claim's prior history.

Consequently, to the extent that Beaty's May 21 filing purports to be an application under 28 U.S.C. § 2244(b)(3)(A), it is denied without prejudice to refiling in the proper form. To the extent that Beaty's May 21 filing requests appointment of counsel, it is denied as moot. Since we deny the application, Beaty's July 18 motion, which appears to relate to the closing of the new case number, is also denied as moot.

V

For the foregoing reasons, we hold that Beaty's inculpatory statements were voluntary within the meaning of the Fifth Amendment. The decision of the district court is therefore

**AFFIRMED.**