#29994-r-JMK
**2023 S.D. 21**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

v.

FITSUM GHEBRE,                            Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRADLEY G. ZELL
Retired Judge

* * * *

BEAU J. BLOUIN of
Minnehaha County Public
    Defender's Office
Sioux Falls, South Dakota              Attorneys for defendant
                                       and appellee.


DANIEL HAGGAR
Minnehaha County State's Attorney

DREW W. DEGROOT
Minnehaha County Deputy State's Attorney
Sioux Falls, South Dakota              Attorneys for plaintiff
                                       and appellant.

* * * *

ARGUED
JANUARY 10, 2023
OPINION FILED **05/10/23**

#29994

KERN, Justice

[¶1.]    The State petitioned for an intermediate appeal from the circuit court's order suppressing statements made by Fitsum Ghebre during the execution of a search warrant. This Court granted the petition. We reverse.

## Background

[¶2.]    The following facts are taken from the record, including police reports, dash and body camera footage, and the suppression hearing transcript. On the morning of November 29, 2020, S.M. woke up in an unfamiliar apartment lying next to a fully clothed man she reported having never met. S.M. remembered waking up clothed from the waist up, but her pants were at her ankles. She asked the stranger if he knew where her phone and keys were, and the stranger replied, "you no have phone or key" in a heavy accent. S.M. then asked to use the man's phone to call her own, hoping to locate it. After making the call, she still could not find her phone, so she asked the man for a ride. She reported that he gave her a ride to her friend's house in a "dark or black SUV."

[¶3.]    The following day, S.M.'s father called law enforcement, reporting that S.M. had been raped in the early morning hours of November 29, 2020. Sioux Falls Police Officer Benjamin Fiegen was dispatched to a Sioux Falls residence to take a report. Upon arrival, Officer Fiegen observed S.M. sitting outside her parent's residence, "trembling" with "tears rolling down her face." S.M. told Officer Fiegen that she had been raped by a man she had "never seen . . . before in [her] life." S.M. described the man as a "'real African' in his mid-40s, with shorter grey hair and a neatly trimmed beard."

[¶4.]      S.M. also described the events leading up to the alleged sexual assault. She explained that on Saturday, November 28, 2020, she and her friend, K.W., went to a Sioux Falls nightclub where she drank "a lot of alcohol," primarily "mixed drinks with Hennessey." S.M. did not remember seeing the stranger at the nightclub. S.M. told Officer Fiegen that after leaving the nightclub, she recalled getting into a car with K.W. and other friends, and they drove to a local motel. She also recollected that before entering the motel, she argued with K.W. However, S.M. could not recall much after this point because she "blacked out from being so drunk." She had no further recollection of entering or leaving the motel.

[¶5.]      She also told Officer Fiegen that she could not remember what had occurred over the course of the evening and early morning hours before she awakened in the stranger's apartment. She reported having pain in her vaginal area and was missing the tampon she had previously inserted. S.M. gave police the stranger's phone number, which remained in her phone after she had used his phone to call her own. By using Google Maps, S.M. was able to point out the location of the stranger's apartment. After taking her report, Officer Fiegen took S.M. to the hospital where she received a medical examination and had evidence collected for a sexual assault kit, from which samples were sent to the South Dakota Forensic Lab for testing.

[¶6.]      Detective Christopher Schoepf was assigned to investigate S.M.'s sexual assault allegation. On December 7, he called the phone number S.M. had provided during her report. The individual who answered identified himself as Fitsum Ghebre. Detective Schoepf followed up by inquiring how Ghebre spells his

name. Because Ghebre had a thick accent and talked quietly, Detective Schoepf struggled to understand Ghebre's response but was able to confirm that he had the correct spelling.

[¶7.]        During the call, Detective Schoepf informed Ghebre that he was calling about the girl that was at his house the other night, and he asked Ghebre if he would like to come to the law enforcement center to talk about the events of that evening. Instead, Ghebre told Detective Schoepf to come to his house. The phone call then ended abruptly and attempts to reestablish contact were unsuccessful. Detective Schoepf ran Ghebre's name through available databases and discovered that he had a 1999 black Subaru Forester registered in his name.

[¶8.]        The South Dakota Forensic Lab returned the test results from S.M.'s sexual assault kit to Detective Schoepf on February 19, 2021. The results revealed the presence of male DNA on three swabs collected from S.M.'s cervical and genital areas, and the lab was able to identify that this DNA originated from a single male source.

[¶9.]        The next day, Detective Schoepf applied for and was granted a search warrant to obtain a sample of Ghebre's DNA through an oral buccal swab. On February 24, 2021, Detective Schoepf drove to Ghebre's apartment building in an unmarked duty vehicle. While he was parked outside, Detective Schoepf saw Ghebre leave his apartment, get into a black Subaru Forester, and drive away. Because Detective Schoepf's unmarked car was not equipped with flashing lights, he radioed for assistance from a marked duty vehicle. Detective Schoepf followed

Ghebre for about 12 blocks before Officer Christensen of the Sioux Falls Police Department arrived and initiated the traffic stop.

[¶10.]     Officer Christensen approached the driver's side window of Ghebre's car and requested that he turn the engine off and step out of the vehicle. Ghebre did not immediately comply, so Officer Christensen repeated his request. Ghebre thereafter complied and, after getting out of his car, walked to the boulevard, where he met with the officers. Detective Schoepf asked Ghebre if he remembered their December phone call about an intoxicated girl that stayed at his house. Ghebre indicated that he did not remember. Detective Schoepf informed Ghebre that the girl filed a report alleging he had raped her and that she had completed a sexual assault kit, the samples from which showed the presence of male DNA. Detective Schoepf also explained that he had obtained a search warrant to collect a DNA sample from Ghebre to compare to the DNA sample from the sexual assault kit.

[¶11.]     Detective Schoepf told Ghebre to stay with Officer Christensen while he went to his patrol car to get a copy of the search warrant. Officer Christensen asked Ghebre if he had his ID on him, and without hesitation, Ghebre immediately retrieved it from his back pocket and handed it to the officer. He also asked Ghebre what time he had to be at work, to which Ghebre responded, "4:30." After a minute of waiting, Detective Schoepf told Ghebre that they would finish the warrant process while sitting in his unmarked duty vehicle and directed Ghebre to sit in the front passenger seat.

[¶12.]     Once in the car, Ghebre sat unrestrained with the passenger door left open. Officer Christensen stood in the passenger doorway with his body camera

recording the encounter. In the car, Detective Schoepf explained the search warrant to Ghebre and the reason for collecting his DNA. He also provided Ghebre with a copy of the warrant. Detective Schoepf explained how he would obtain the DNA sample by swiping the inside of Ghebre's cheek with a buccal swab. After giving his explanation, Detective Schoepf mentioned to Ghebre that he looked confused and asked if he had any questions. Ghebre did not answer but proceeded to look down at the copy of the warrant that Detective Schoepf had just handed him. Detective Schoepf then stated, "And if you want to talk about it, give me a call, that's what I was trying to do that day when I talked to you." Detective Schoepf then executed the warrant by swabbing the inside of Ghebre's mouth. As Detective Schoepf packaged the buccal swabs, he asked Ghebre, "[D]o you have questions for me or anything like that right now?" Ghebre did not respond.

[¶13.] Detective Schoepf completed the search warrant's inventory sheet. He then asked Ghebre to sign it and told him that he would receive a copy, but Ghebre responded, "[N]o"—indicating that he was not going to sign it. Ghebre spontaneously remarked that he "doesn't know that girl." To which Detective Schoepf asked, "[Y]ou didn't know her?" Ghebre's response was inaudible. After this brief exchange, the following conversation took place as reflected by the video recording:

> SCHOEPF: Do you have any questions for me? Do you want to talk about what happened at all? We're not going to talk about it right here, but we can make an arrangement to talk about it. Do you want to talk about what happened? Here's your driver's license. (Hands driver's license back to Ghebre). You're free to go. Do you want to talk about what happened though? Here's my thing man, if you had sex with her, that's what you need to explain to me now. Okay? Not right this minute, but call me

and we'll talk about it.  Okay?  Here's my card.  If you had sex with her, you had sex with her.  The DNA is going to tell us on that kit if that was you that had sex with her.[1]

GHEBRE: I have problem.  How I . . .

SCHOEPF: What's that?

GHEBRE: Have problem to

SCHOEPF: You have problems?

GHEBRE: why I sex, says. . .

SCHOEPF: I don't understand.

GHEBRE: I have problem for sex.

SCHOEPF: Okay?

GHEBRE: I can't go . . . (inaudible)

SCHOEPF: You can't achieve an erection, is that what I'm understanding?

GHEBRE: Yes.

SCHOEPF: Okay?  Did you have oral sex with her? Or stick your fingers in her?

GHEBRE: No.

SCHOEPF: No.  Okay, so that's not going to be your DNA on the sexual assault kit?

GHEBRE: (inaudible) (shakes head)

SCHOEPF: No?  Okay?

GHEBRE: (inaudible)

---

1.  After Detective Schoepf told Ghebre he was free to go, Officer Christensen takes a noticeable step back and off to the side from where he previously stood in the open doorway of Detective Schoepf's vehicle.

SCHOEPF: Okay.  Okay.  We'll be in contact once that comes back.  Okay?

[¶14.]     Detective Schoepf sent the buccal swabs to the South Dakota Forensic Lab for examination.  The results of the DNA testing revealed that the DNA recovered from Ghebre's buccal swabs matched the single origin male DNA collected from S.M.'s sexual assault kit.

[¶15.]     A Minnehaha County grand jury indicted Ghebre on April 28, 2021, for one count of rape in the third degree in violation of SDCL 22-22-1(4) and one count of sexual contact with a person incapable of consenting in violation of SDCL 22-22-7.2.  On July 29, 2021, Ghebre moved to suppress the statements he made to law enforcement during the execution of the search warrant on February 24, 2021, arguing that the statements were obtained in violation of *Miranda*.  The State opposed the motion, arguing that because Ghebre was never in custody, the officers were not required to read him the *Miranda* warnings.

[¶16.]     The circuit court held a hearing on the motion on January 18, 2022.  Before the hearing, Ghebre's counsel contacted the court and State, expressing his desire to supplement his suppression motion with a Fourteenth Amendment Due Process argument alleging that Ghebre's statements were involuntarily made.  The court and the parties agreed to hold the hearing as scheduled, but the court allowed two weeks for supplemental briefing on the voluntariness issue.

[¶17.]     At the hearing, Detective Schoepf testified about his December phone call with Ghebre and the circumstances of the search warrant's execution.  During his testimony, Detective Schoepf acknowledged that he had trouble understanding Ghebre during the initial phone call, and it had taken him a few tries to understand

Ghebre clearly enough to correctly spell his name. Detective Schoepf testified that his difficulty stemmed from Ghebre's thick accent, and Ghebre was very quiet on the phone. He further testified that the phone call did not leave him with the impression that Ghebre struggled to understand him.

[¶18.]     Regarding his execution of the search warrant, Detective Schoepf testified that Ghebre was unresponsive to several questions that he had asked him and seemed confused at certain times during the stop. Detective Schoepf agreed that during their conversation, Ghebre had trouble articulating the nature of the sexual problem he claimed to suffer. Detective Schoepf also admitted that he was trying to elicit some immediate answers about the alleged offense but stated that this conversation occurred only after he told Ghebre that he was free to leave. He acknowledged that after Ghebre left the scene, he told Officer Christensen, "Well, I like that," in regard to getting the interaction on tape.

[¶19.]     After considering the post-hearing briefs filed by the parties addressing Ghebre's due process argument, the circuit court held that Ghebre's statements to Detective Schoepf were involuntary. The court found that:

> Detective Schoepf ignored the obvious language barrier between himself and defendant; bodycam video footage demonstrates that Defendant was confused and largely unresponsive throughout the entirety of the encounter; Detective Schoepf admitted at the suppression hearing that there were difficulties in communicating with Defendant and that he was not sure how much Defendant understood; Detective Schoepf did not attempt to call an interpreter to assist Defendant, even after telling Defendant he "looked confused"; Officer Christensen kept the passenger door ajar but stood directly outside the door so Defendant could not exit. Based on Defendant's clear difficulty in understanding the officers, the Court is not persuaded that Defendant fully understood his rights at that time.

Although the court found that Ghebre was not "in custody" for purposes of *Miranda*, the court determined that Ghebre's statements to Detective Schoepf were involuntary under the Due Process Clause of the Fourteenth Amendment. Therefore, the court granted Ghebre's motion to suppress and filed an order on May 13, 2022, suppressing Ghebre's February 24, 2021 statements to law enforcement.

[¶20.] The State petitioned for intermediate appeal, which we granted. On appeal, the State raises one issue, arguing that the circuit court erred by concluding that Ghebre's statements were involuntarily made under the Due Process Clause of the Fourteenth Amendment.

**Standard of Review**

[¶21.] "The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence, over objection, of a confession obtained through coercion." *State v. Holman*, 2006 S.D. 82, ¶ 14, 721 N.W.2d 452, 456 (citing *Payne v. Arkansas*, 356 U.S. 560, 568, 78 S. Ct. 844, 850, 2 L. Ed. 2d 975 (1958)). Whether a statement was voluntarily made is a "legal question, requiring independent judicial review." *State v. Morato*, 2000 S.D. 149, ¶ 11, 619 N.W.2d 655, 659. We "review[] the entire record and make[] an independent determination of voluntariness." *Holman*, 2006 S.D. 82, ¶ 13, 721 N.W.2d at 456. "In addressing a Due Process voluntariness challenge, the circumstances surrounding an interrogation are factual questions meriting deferential review." *Morato*, 2000 S.D. 149, ¶ 11, 619 N.W.2d at 659. It is the State's burden to show by a preponderance of the evidence that a defendant's statement was voluntarily made. *State v. Fisher*, 2011 S.D. 74, ¶ 18, 805 N.W.2d 571, 575.

**Analysis and Decision**

[¶22.]     The State argues that the circuit court erred by concluding Ghebre's statements were involuntary.  The State contends that the actions of Officer Christensen and Detective Schoepf were free from overt and implicit deception, coercion, manipulation, or improper influence.  The State further asserts that when weighed against Ghebre's capacity to resist police pressure, law enforcement's conduct did not overbear Ghebre's will to make an autonomous, unconstrained statement.

[¶23.]     Statements obtained involuntarily through improper police pressure or by overbearing a defendant's will violate the Due Process Clause of the Fourteenth Amendment.  *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S. Ct. 1246, 1251, 113 L. Ed. 2d 302 (1991).  "The test for determining [the] voluntariness of incriminating statements or confessions requires the [circuit] court to consider the effect [that] the totality of the circumstances had upon the will of the defendant and whether that will was overborne." *State v. Gesinger*, 1997 S.D. 6, ¶ 12, 559 N.W.2d 549, 550 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).  To determine whether a defendant's will was overborne, we consider the following:

> the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts.

*State v. Wright*, 2009 S.D. 51, ¶ 33, 768 N.W.2d 512, 524 (citation omitted). These circumstances are considered in light of any coercive or deceptive law enforcement conduct. *State v. Darby*, 1996 S.D. 127, ¶ 31, 556 N.W.2d 311, 320; *see Wright*, 2009 S.D. 51, ¶ 33, 768 N.W.2d at 524. However, even the existence of a police ruse does not make a statement per se involuntary. *Darby*, 1996 S.D. 127, ¶ 31, 556 N.W.2d at 320. "[T]he police may use some psychological tactics in interrogating a suspect," so long as the confession is voluntary, meaning it is "a product of the suspects own balancing of competing considerations." *Id.*

[¶24.]     The question we must answer is not whether the conduct of the officers was the "but for cause" of a defendant's statements, but whether the officer's conduct was "so manipulative or coercive" that it deprived the defendant of his or her "ability to make an unconstrained, autonomous decision" to make statements to the officer. *State v. Tuttle*, 2002 S.D. 94, ¶ 23, n.7, 650 N.W.2d 20, 31, n.7 (citation omitted); *State v. Owens*, 2002 S.D. 42, ¶ 52, 643 N.W.2d 735, 750.

[¶25.]     Based on the record before us and the lack of improper police pressure surrounding Ghebre's encounter with law enforcement, we conclude that the officers' conduct and the circumstances of the encounter did not overpower Ghebre's free will. "[A] statement may be considered involuntary if it is 'extracted by any sorts of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Beaty v. Schriro*, 509 F.3d 994, 999 (9th Cir. 2007) (second and third alterations in original) (quoting *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 203, 50 L. Ed. 2d 194, 197 (1976) (per curiam)). The circumstances of Ghebre's encounter do not indicate improper police pressure.

He was not detained for a long period of time nor was he exposed to prolonged or repeated questioning. Rather, the video of Ghebre's interaction with law enforcement indicates that it lasted no longer than nine and a half minutes, five of which Ghebre spent sitting unrestrained in the front passenger seat of Detective Schoepf's unmarked duty vehicle. And during these five minutes Ghebre spoke with Detective Schoepf for only two minutes—the majority of which occurred after the Detective handed Ghebre his license and told him he was "free to go."

[¶26.] Furthermore, upon consideration of Ghebre's personal circumstances, we are not persuaded that his will was overborne. At the time of the stop, Ghebre was 40 years old and had lived in America for 12 years. The record reflects that Ghebre maintained gainful employment. Furthermore, this was not his first encounter with law enforcement. In the four years leading up to the search warrant, Ghebre had two police encounters, including a DWI charge, where he was required to appear in court.

[¶27.] Ghebre, however, contends that Detective Schoepf's decision to question him without an interpreter was a subtle and coercive tactic targeted to capitalize on his linguistic vulnerability and overbear his self-will in order to elicit inculpatory statements. A defendant's ability to understand, process, and communicate information is relevant to an individual's susceptibility to police pressure. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 520, 93 L. Ed. 2d 473 (1986). However, the existence of some vulnerability or condition making one more susceptible to police pressure does not "itself and apart from its relation to official coercion . . . dispose of the inquiry into constitutional 'voluntariness.'" *Id.*

The defendant's susceptibility becomes relevant when considering the "quantum of coercion" necessary to overbear the defendant's self-will. *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002).

[¶28.] Much of Ghebre's subtle coercion argument rests on Detective Schoepf's testimony that Ghebre had a "thick accent" as evidence that Ghebre had trouble understanding and processing English. But without some evidence, which the record does not contain, establishing that Ghebre had trouble understanding English, we do not equate having an accent with being unable to comprehend a nonnative language. While it may have been difficult for Detective Schoepf to understand Ghebre during their initial phone call, this does not mean Ghebre was unable to comprehend or process the nature of his interaction with Detective Schoepf. At no point during their interaction did Ghebre tell Detective Schoepf that he did not understand English or request clarification of a question.

[¶29.] When reaching its conclusion, the circuit court placed undue weight on Ghebre's unresponsiveness during the police encounter. Ghebre's decision to remain silent is not necessarily evidence of an inability to comprehend or process information. Rather, remaining silent in the face of police questioning could reflect a voluntary choice and a nuanced understanding of the situation.

[¶30.] Further, it appears that the court improperly conflated the Fourteenth Amendment due process analysis with the requirements of *Miranda* in concluding that it was "not persuaded that [Ghebre] fully understood his rights at that time." Although Ghebre was not Mirandized before Detective Schoepf's questions, which is considered under the totality of the circumstances, there was no obligation for law

enforcement to ensure that Ghebre knew or understood his rights before questioning him in a noncustodial setting. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966) (holding that such procedural safeguards are only required before custodial interrogation). "[O]nly '[i]ndividuals subject to a custodial interrogation are entitled to *Miranda* warnings.'" *State v. Hopkins*, 2017 S.D. 13, ¶ 6, 893 N.W.2d 536, 539 (second alteration in original) (citation omitted). And, here, the circuit court determined that Ghebre was not in custody for purposes of *Miranda*—a decision Ghebre does not contest on appeal. Therefore, Detective Schoepf had no obligation to inform Ghebre of his constitutional rights, let alone ensure he understood them. *See Berkemer v. McCarty*, 468 U.S. 420, 437–38, 104 S. Ct. 3138, 3149, 82 L. Ed. 2d 317, 333 (1984).

[¶31.] In summary, based on our review of the totality of the circumstances, we determine the circuit court erred in concluding that Ghebre's statements to Detective Schoepf were involuntarily made. Ghebre's personal circumstances, as set forth in the record, do not support the court's conclusion that Ghebre's will was overborne: Ghebre was 40 years old, gainfully employed, had lived in the country for 12 years, and had prior experience with law enforcement.

[¶32.] Additionally, before getting into the patrol car, Ghebre demonstrated comprehension and understanding of the English language by responding appropriately to the Officers' questions and commands. Once he was seated in the car and presented with the search warrant, Ghebre remained silent during Detective Schoepf's questions and refused to sign the search warrant inventory sheet.

[¶33.]     It was not until after Detective Schoepf handed Ghebre his driver's license and told him that he was free to leave that Ghebre started to talk.  Each of his statements that followed were of an exculpatory nature.  First, he claimed not to know S.M., and second, he stated that he had sexual problems, meaning that he could not get an erection.  These statements illustrate that Ghebre understood the allegations against him and could formulate a response to maintain his innocence.

[¶34.]     In addition to Ghebre's unilateral decision to speak with Detective Schoepf, the lack of "coercive police activity" is determinative here. *Connelly*, 479 U.S. at 164, 107 S. Ct. at 522.  The record contains no indication that law enforcement's conduct had the effect of overbearing Ghebre's will.  Rather, Ghebre's statements are evidence that he balanced "competing considerations" available to him and elected to speak to the officer.

[¶35.]     Accordingly, we reverse and remand the circuit court's order granting Ghebre's motion to suppress for proceedings consistent with this opinion.

[¶36.]     JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, concur.

[¶37.]     MYREN, Justice, dissents without a writing.